No. 51,244

# In the Interest of DEBRA BROOKS, A Deprived Child Less Than 18 Years of Age.

(618 P.2d 814)

542

Opinion filed November 1, 1980.

*Karl A. Menninger, II,* of the Mid-Central Legal Center for the Developmentally Disabled, of Kansas City, argued the cause, and *William J. Dittmeier* and *Penny R. Furman,* of the same agency, were with him on the brief for the appellants.

*Muriel Andreopoulos,* special juvenile prosecutor, argued the cause, and *Robert T. Stephan,* attorney general, and *Nick A. Tomasic,* district attorney, were with her on the brief for the appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an appeal by Mary Ann Brooks and Jimmy Brooks from an order of the district court severing their parental rights in Debra Brooks, pursuant to K.S.A. 1978 Supp. 38-824(c).

The three issues before this court are:

1. Is the term "unfit" in K.S.A. 1978 Supp. 38-824(c) unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment to the United States Constitution?

2. Does K.S.A. 1978 Supp. 38-824(c) violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it fails to incorporate the doctrine of the least restrictive alternative?

3. Was there sufficient evidence in this case to justify a finding of "unfitness"?

Inasmuch as the facts of this case are not involved in the determination of the constitutional issues, the recitation of same will be reserved until later in the opinion.

K.S.A. 1978 Supp. 38-824 provides in pertinent part:

"(a) The provisions of this section shall apply to any child under the age of eighteen (18) years found to be a deprived child, within the meaning of this act, either at the initial hearing or any subsequent hearing.

. . . .

"(c) When the parents, or parent in case there is one parent only, are found and adjudged to be unfit to have the custody of such deprived child, K.S.A. 1978 Supp. 38-820, and other applicable provisions of this act having been fully complied with, the district court may make an order permanently depriving such parents, or parent, of parental rights and commit the child:

"(1) To the care of some reputable citizen of good moral character;

"(2) to care of some suitable public or private institution used as a home or place of detention;

"(3) to the care of some association willing to receive the child, embracing in its objects the purpose of caring for or obtaining homes for deprived children;

"(4) to the secretary of social and rehabilitation services."

By 1979 amendment the following language was substituted for (c)(2) above:

"(2) to a youth residential facility, subject to the limitations of subsection (f) of K.S.A. 1979 Supp. 38-819;"

This amendment is not pertinent to any issues herein.

The appellants contend the term "unfit" in K.S.A. 1978 Supp. 38-824(c) is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Specifically, appellants argue the term "unfit" is unconstitutionally vague because it (1) does not provide sufficient notice of what conduct the State is seeking to prohibit; (2) permits arbitrary and discriminatory enforcement of the law; and (3) inhibits the exercise of protected rights. These are the standards set forth in *Grayned v. City of Rockford,* 408 U.S. 104, 33 L.Ed.2d 222, 92 S.Ct. 2294 (1972), for determining whether a criminal statute is impermissibly vague.

The general principles which the courts must apply in determining the constitutionality of a statute were set forth in *City of Baxter Springs v. Bryant,* 226 Kan. 383, Syl. ¶¶ 1-4, 598 P.2d 1051 (1979), and reaffirmed in *In re Jones,* 228 Kan. 90, 95, 612 P.2d 1211 (1980), as follows:

"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution."

"In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done."

"Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt."

"The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public interest as that is a legislative function with which courts cannot interfere."

In determining constitutional challenges for vagueness, greater leeway is afforded statutes regulating business than those proscribing criminal conduct. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 31 L.Ed.2d 110, 92 S.Ct. 839 (1972). *Davis v. Smith,* 266 Ark. 112, 583 S.W.2d 37 (1979), contains a well reasoned discussion of the distinction and by what standards statutes pertaining to termination of parental rights should be judged. The Supreme Court of Arkansas concluded at pp. 120-121:

"[W]here standards for termination of parental rights are the subject of the statute involved, the application of 'vagueness' tests should lie somewhere between that given criminal law statutes and that given statutes regulating business, i.e., permitting greater flexibility than where criminal law statutes are involved and less flexibility than with business-regulatory statutes. See *Minor Children of F. B. v. Caruthers,* 323 S.W.2d 397 (Mo. App. 1959). This is because any parent should have some basic understanding of his obligations to his children, but many cannot be as alert to, and aware of, prevailing practices basic to establishment of standards as those engaging in business would likely be to settled and well understood standards and practices. Mathematical certainty in language is not to be expected in any statute. *Grayned v. City of Rockford,* supra. See also, *Robinson v. United States,* 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945). Flexibility and reasonable breadth, rather than meticulous specificity or great exactitude, in a statute are permissible, so long as its reach is clearly delineated in words of common understanding. *Grayned v. City of Rockford,* supra; *Minor Children of F. B. v. Caruthers,* 323 S.W.2d 397 (Mo. App. 1959). A statute which defines boundaries sufficiently distinct for citizens, policemen, juries and appellate judges is not impermissibly vague. *Grayned v. City of Rockford,* supra. Impossible standards of specificity are not required by the constitution, even in criminal statutes, and a statute meets constitutional muster, if the language used conveys sufficient warning when measured by common understanding and practice. *Jordan v. DeGeorge,* 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); *United States v. Petrillo,* 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). It is not necessary that all kinds of conduct falling within the reach of the statute be particularized. *City of Chicago v. Fort,* 46 Ill. 2d 12, 262 N.E.2d 473 (1970). A statute is not to be struck down as vague only because marginal cases could be put where doubts might arise. *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). The futility of anticipating and enumerating every means or method a fertile mind might devise that would come within the purview of a statute is obvious. *City of Chicago v. Fort,* supra; *Minor Children of F. B. v. Caruthers,* supra."

We concur with and adopt the aforecited portion of the Arkansas opinion.

Kansas has long held that a statute will not be declared void for vagueness and uncertainty where it employs words commonly used, previously judicially defined, or having a settled meaning in law. *Kansas City Millwright Co., Inc. v. Kalb,* 221 Kan. 658,

562 P.2d 65 (1977). At its heart the test for vagueness is a common-sense determination of fundamental fairness.

Having stated the standards to be applied in determining whether a statute is impermissibly vague, we turn now to application of the tests to the statute in question.

The appellants rely heavily on *Alsager v. District Court of Polk Cty., Iowa,* 406 F. Supp. 10 (S.D. Iowa 1975), *aff'd* 545 F.2d 1137 (8th Cir. 1976), wherein a federal district court struck down an Iowa termination statute on the grounds of vagueness. The Iowa statute (Iowa Code § 232.41) provided:

"The court may upon petition terminate the relationship between parent and child:

. . . .

"2. If the court finds that one or more of the following conditions exist:

"a. That the parents have abandoned the child.

"b. That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection.

"c. That although financially able, the parents have substantially and continuously neglected to provide the child with necessary subsistence, education, or other care necessary for physical or mental health or morals of the child or have neglected to pay for subsistence, education, or other care of the child when legal custody is lodged with others.

"d. That the parents are unfit by reasons of debauchery, intoxication, habitual use of narcotic drugs, repeated lewd and lascivious behavior, or other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child.

"e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination."

The *Alsager* conclusions relative to vagueness are intermingled with other concerns, such as notice of the proceedings, adequacy of the termination proceedings, and standard of proof. A careful reading of the case reflects that the court essentially applied the criminal statute test for vagueness. Further, the court was concerned that the Iowa statute permitted termination without a showing of "high and substantial degree of harm to the children." The court in *Alsager* also noted at pp. 19-20:

"[T]he Court must next determine whether this vagueness has been cured, either generally, by the Iowa Supreme Court's decisions in other termination cases, or specifically, by the Iowa Supreme Court's opinion in this case. As the United States Supreme Court indicated in *Grayned, supra,* the defect of an enactment's vagueness can be ameliorated by a state court construction restricting the vague standards to constitutionally permissible bounds. In fact, in *Grayned,* the Court concluded that an imprecise phrase in an anti-noise statute had been cured by the

Illinois Supreme Court's delimiting construction of a similar phrase in another ordinance. 408 U.S. at 111, 92 S.Ct. 2294. *Grayned* thus suggests that the Iowa standards may be saved from their unconstitutional vagueness if the needed specificity has been supplied by the Iowa Supreme Court. Regrettably, the Iowa Supreme Court has not perfected a general or specific cure of these standards.

"The parental termination statute presently under attack was enacted in 1965 by the Sixty-first General Assembly of the State of Iowa. Since then a number of cases brought pursuant thereto have been reviewed de novo by the Iowa Supreme Court. In the great majority of decisions involving an application of the standards of 'necessary parental care and protection,' and of '[parental] conduct . . . detrimental to the physical or mental health or morals of the child,' the Iowa court has simply made a determination as to the 'substantiality of the evidence' to support a finding based on those standards. The Iowa court has never attempted a restrictive construction of the termination standards themselves. Moreover, the Iowa courts did not attempt to restrict the scope of the statute while terminating the Alsagers' parent-child relationships. Indeed, the Alsagers were subjected to all the vagueness dangers inherent in the indefinite standards of § 232.41(2)(b) and (d)."

Kansas appellate courts have repeatedly construed the term "unfit" in the statute. *In re Kerns*, 225 Kan. 746, 753, 594 P.2d 187 (1979), reviews many prior decisions. *In re Johnson*, 214 Kan. 780, 784, 522 P.2d 330 (1974), concluded that parental unfitness was not defined by our statutes but applied prior construction. Illustrative of such judicial constructions are the following:

1. *In re Vallimont*, 182 Kan. 334, 340, 321 P.2d 190 (1958):

"Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, *incapacity to appreciate and perform the obligations resting upon parents* might render them unfit, apart from other moral defects."

2. *Finney v. Finney*, 201 Kan. 263, Syl. ¶ 2, 440 P.2d 608 (1968), had this to say:

"The word 'unfit' means, in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody."

3. *In re Penn*, 2 Kan. App. 2d 623, 625, 585 P.2d 1072 (1978), held:

"The word 'unfit' means in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their

child, the word usually although not necessarily imports something of moral delinquency. *In re Armentrout,* 207 Kan. 366, Syl. ¶ 3, 485 P.2d 183 (1971). So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from any other defects. *In re Vallimont,* 182 Kan. at 340.

"Inherent mental and emotional incapacity to perform parental obligations can constitute such breach of parental duty as to make the parents unfit to be entrusted with custody of their child. See K.S.A. 1977 Supp. 38-824(*c*); *In re Johnson,* 214 Kan. 780, 522 P.2d 330 (1974); *In re Bachelor,* 211 Kan. [879] at 883 [508 P.2d 862 (1973)]."

The Iowa statute involved in *Alsager* is distinguishable. In Iowa the action was brought to sever the parental rights. In making such a determination the court could sever parental rights if the parents had committed any of the specified acts *or* were unfit. Under the Kansas statute the court must find the children to be deprived before the issue of termination is reached. The termination of parental rights is rather dispositional in nature. K.S.A. 1978 Supp. 38-824(*a*) provides:

"(*a*) The provisions of this section shall apply to any child under the age of eighteen (18) years found to be a deprived child, within the meaning of this act, either at the initial hearing or any subsequent hearing."

Subsection (*b*) sets forth permissible dispositions for deprived children where parental rights have not been severed, and subsection (*c*) sets forth permissible dispositions where parental rights have been severed. A deprived child is defined in K.S.A. 1979 Supp. 38-802(*g*) as follows:

"(*g*) 'Deprived child' means a child less than eighteen (18) years of age:

"(1) Who is without proper parental care or control, subsistence, education as required by law or other care or control necessary for such child's physical, mental or emotional health, and the deprivation is not due solely to the lack of financial means of such child's parents, guardian or other custodian;

"(2) who has been placed for care or adoption in violation of law;

"(3) who has been abandoned or physically, mentally, emotionally abused or neglected or sexually abused by his or her parent, guardian or other custodian; or

"(4) who is without a parent, guardian or legal custodian."

We conclude that the term "unfit" in K.S.A. 1978 Supp. 38-824 is not impermissibly vague as previously construed and defined by the appellate courts of Kansas.

The next issue is whether K.S.A. 1978 Supp. 38-824(*c*) violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it does not incorporate the doctrine of the least restrictive alternative in the criteria for the

termination of parental rights. This doctrine was set forth in *Shelton v. Tucker,* 364 U.S. 479, 488, 5 L.Ed.2d 231, 81 S.Ct. 247 (1960), as follows:

"In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose."

Appellants do not contest the fact that the State of Kansas has a legitimate interest in the welfare of children within its borders. Obviously, a parent's right to rear his own children is a fundamental right. In cases involving deprived children, conflicts in rights frequently arise.

K.S.A. 1979 Supp. 38-801 provides:

"**38-801. Construction of juvenile code; proceedings not criminal.** This act shall be liberally construed, to the end that each child coming within its provisions shall receive such care, custody, guidance, control and discipline, preferably in the child's own home, as will best serve the child's welfare and the best interests of the state. In no case shall any order, judgment or decree of the district court, in any proceedings under the provisions of this act, be deemed or held to import a criminal act on the part of any child; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state."

*In re Armentrout,* 207 Kan. 366, 370-371, 485 P.2d 183 (1971), discusses the relative rights of the State and the parents as follows:

"While the welfare and best interests of children are of paramount consideration in determining an award of custody, as between parents whose marriage has been separated by divorce or separate maintenance, in a proceeding to sever parental rights, the welfare of the child or children must be considered in conjunction with the rights of the parents. A parent will not be permanently deprived of the parental rights to a child unless such parent is found to be an unfit person. The rule and reasoning in support thereof is well stated by Justice Dawson in *In re Kailer,* 123 Kan. 229, 255 Pac. 41:

" 'Noting respondents' objections to this judgment, it is urged that the welfare and best interests of the children were the paramount issue. Under the law of the land the welfare and best interests of children are primarily the concern of their parents, and it is only when parents are unfit to have the custody, rearing and education of children, that the state as *parens patriae,* with its courts and judges, steps in to find fitting custodians *in loco parentium.*

. . . .

" 'Putting the matter in another way, it is quite correct to say that the welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in

the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. This is the law of the land on this subject. And it never becomes a *judicial* question as to what is for the welfare and best inte. ests of children until the exceptional case arises where the parents are dead, or where they are unfit to be entrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or where the right has been prejudiced by the discord of the parents themselves. There are enough of the latter sort of cases where the courts are compelled to interfere and take the custody of children from unfit parents, or to decide which of quarreling parents should have their custody. . . .' (pp. 230-231.)

"The rule stated in *Kailer* was quoted in *Christlieb v. Christlieb,* 179 Kan. 408, 295 P.2d 658, and again in the case of *In re Vallimont,* 182 Kan. 334, 321 P.2d 190, wherein it was further pointed out:

" 'It is definitely established that when the custody of children becomes an issue as between parents, the primary question to be determined by the court is the welfare and best interests of the children, and all other questions are subordinate thereto. . . . But this is not the situation presented by the facts in the instant case. Here the father seeks custody from the maternal grandparents.' (pp. 336-337.)

"To further settle the matter, Justice Schroeder in the *Vallimont* opinion quoted with approval from the decision in *Stout v. Stout,* 166 Kan. 459, 201 P.2d 637:

" '. . . It will suffice to say that if there is any language to be found in any of our decisions justifying the construction that the children of a natural parent may be given to third persons without a finding such parent is an unfit person to have their custody it should be and is hereby disapproved.' (p. 337.)

"The statutes under which this proceeding is brought actually amount to a codification of the rulings pertaining to severance of parental rights which have been laid down by this court in the cases mentioned.

"In the case of *Lennon v. State,* 193 Kan. 685, 396 P.2d 290, this court considered severance of parental rights under the provisions of the Juvenile Code in essentially their present form. Considerable emphasis was given the welfare of the child, but a careful examination of the evidence recited and the evaluation thereof clearly indicates the court tacitly said the mother was unfit. She was described in these terms:

" '. . . Mary's record throughout her adult years reveals gross instability and lack of moral fiber. . . .' (p. 690.)"

## Further in the opinion it was said:

" 'We readily agree that parental rights are not to be considered lightly, and this court has always been diligent in their protection. (*Swarens v. Swarens,* 78 Kan. 682, 97 Pac. 968; *Pinney v. Sulzen,* [91 Kan. 407, 137 Pac. 987], supra.) However, when the welfare of a child so demands, the rights of its parents must yield to the paramount right of their offspring to receive proper parental care, guidance and control. Where such be the case, the state, in the rightful exercise of its power as *parens patriae,* has the duty to intervene on behalf of the child in furtherance of its legitimate interests. (citing case).' (p. 691.)

"In determining questions concerning custody or severance of parental rights, a close relationship exists between the fitness of a parent to have custody and the

welfare of the child whose custody is in issue. While a higher degree of proof is required with respect to parental rights, the unfitness of a parent controls as to an issue of custody between a parent and a third party as well as with respect to severance of parental rights. In either case the parent must be found to be an unfit person. (*Finney v. Finney,* 201 Kan. 263, 440 P.2d 608.)"

Severance or termination of parental rights is obviously the most drastic disposition which may be imposed in such cases and may only be utilized upon a finding the parents are unfit by clear and convincing evidence. Usually, but not necessarily, severance proceedings are instituted only after attempts by the court to rehabilitate the family unit have failed. Frequently, a long passage of time occurs between the original adjudication that the child is deprived and the institution of the termination proceeding. "Unfit" was defined as "unsuitable, incompetent or not adapted for a particular use or service." *In re Armentrout,* Syl. ¶ 3. Inherent in the term is that the parent is unfit now and in all reasonable likelihood will remain so in the future. Certainly termination of parental rights destroys the family unit, but generally the actual destruction of the family unit occurred earlier and was the result of the action or inaction of the parents themselves. To perceive a termination proceeding as the State seeking to destroy a functioning family unit is unrealistic.

The Kansas Court of Appeals in *In re Atwood,* 2 Kan. App. 2d 680, 681-682, 587 P.2d 1 (1978), held:

"To determine that the best interests of the child would be served by a termination of parental rights, the court must find that under no reasonable circumstances can the welfare of the child be served by a continuation of the parent-child relationship. This test requires the court to explore and specifically eliminate alternative remedies before imposing the drastic remedy of parental severance. See *People, Int. of M. M.,* 184 Colo. 298, 520 P.2d 128 (1974). The welfare and best interests of children are primarily the concern of their parents, and it is only when parents are unfit to have the custody, rearing and education of children that the state as *parens patriae,* with its courts and judges, steps in to find fitting custodians *in loco parentium. In re Armentrout,* 207 Kan. at 370 citing *In re Kailer,* 123 Kan. 229, 255 Pac. 41 (1927). See also *In re Bachelor,* 211 Kan. 879, 882, 508 P.2d 862 (1973); *In re Vallimont,* 182 Kan. 334, 321 P.2d 190 (1958)."

Without expressly so stating, the court in *Atwood* acknowledges the doctrine of the least restrictive alternative and judicially construes it into the statute. We approve the cited language of *Atwood* except for the following sentence: "This test requires the court to explore and specifically eliminate alternative remedies before imposing the drastic remedy of parental severance." In

many areas of the state there are dozens of agencies and programs designed to assist families in resolving their problems. To require a court specifically to explore, consider and reject each such program prior to termination is unrealistic and could be disastrous. Certainly if a particular program is proposed as an alternative the court should give careful consideration to the proposal. Most of the programs have much in common and to be successful in any of these programs parents must cooperate with the agency, must keep appointments, must have a sincere desire to improve their family life, and must be willing to accept counseling.

We conclude the better test to be: The court should carefully consider any particular alternative remedy proposed by an interested party in the case, and if rejected the court should state its reasons for such rejection. The drastic remedy of termination of parental rights should not be utilized unless the court is satisfied there is no realistic alternative and so finds.

We conclude that K.S.A. 1978 Supp. 38-824(c), as herein judicially construed, does not violate the Due Process Clause of the Fourteenth Amendment for failure to incorporate the doctrine of the least restrictive alternative.

We turn now to the final issue, which is whether there was sufficient evidence of parental unfitness to terminate appellants' parental rights.

Appellants Mary Ann and Jimmy Brooks, husband and wife, are mentally retarded young adults. They maintain a household on Supplemental Security Income (S.S.I.) payments which are augmented by income from odd jobs performed by the husband. Jimmy has diligently sought work and conscientiously performed his work. SRS had apparently been involved with appellants prior to the conception of the child and at all times relevant herein.

The appellants were residing in Montgomery County in 1974. Jimmy's father lived with the couple, caused Mary Ann to become inebriated, and fathered the child, Debra, while Mary Ann was so incapacitated. Debra was born on November 21, 1974, in a Montgomery County hospital. The facts relative to the conception are undisputed. Upon learning of Mary Ann's pregnancy, Jimmy forcibly ejected his father from the household. The appellants are convinced that the ejection of Mr. Brooks, Sr., from the household caused the ultimate loss of the child from their

custody. No moral delinquency on the part of Mary Ann was or should be inferred from the circumstances of Debra's conception.

Knowledge of this fact is necessary in order to understand some of the evidence in the case. The emphasis of the issue of parental fitness was on Mary Ann's ability to rear the child.

The information as to court proceedings in Montgomery County is sketchy and we know little of the then existing circumstances. We do know Debra was placed in foster care at birth but was returned to appellants at age three months. She resided with appellants for approximately one month when she was hospitalized for pneumonia. Upon her recovery, she was again placed in foster care where she has continuously resided. On August 5, 1976, the Montgomery County Juvenile Court adjudicated Debra to be a dependent and neglected child. In that action Mary Ann was served as the natural mother and Jimmy was served as the stepfather. Both were represented by court-appointed counsel. The court had before it mental evaluations of both parents. What other evidence was presented we do not know. No appeal was taken from that adjudication and we can only conclude it was a legally correct and proper proceeding. The court placed custody of the child in SRS with the recommendation "that she be placed permanently in the Bill Mark foster home." Visitation rights were granted appellants.

In 1978 the foster parents moved to Wyandotte County and on June 14, 1978, the case was transferred to that county. The appellants appeared in person and by counsel at the hearing on the motion to transfer.

On October 11, 1978, the action herein was filed in Wyandotte County, seeking termination of the parental rights of Mary Ann Brooks, natural mother, and "Jimmy Brooks and James Brooks, Sr., alleged natural fathers." Appellants were present in person and by counsel during the proceedings. Mr. Brooks, Sr., was served by publication but appeared only by court-appointed counsel. On March 23, 1979, the court adjudicated Mr. Brooks, Sr., to be the natural father of Debra and terminated his parental rights. No appeal was taken by Mr. Brooks, Sr., from that adjudication and the appellants do not challenge the court's finding as to the paternity of Debra. The appellants appeal from that portion of the decision which found them to be unfit and terminated their parental rights.

Evidentially, the case presented some logistical problems. Debra was taken from the parents and adjudicated a deprived child in Montgomery County. The child and her foster parents resided in Wyandotte County, whereas the appellants were residing in Crawford County. Appellants and Debra had been wholly separated from the time Debra was four months old until the date of the hearing, except for two or three visits. The infrequency of visits was not occasioned by any lack of interest on the part of appellants. In such circumstances most of the witnesses were personally familiar with either Debra or appellants, but not with all three. The witnesses had reports available to them.

Appellants do not challenge the admissibility of the evidence, but contend it was insufficient to support the finding of unfitness. The trial court's memorandum decision summarizes the evidence and states the basis for its decision. The memorandum decision, in appropriate part, is as follows:

"The questions before the Court are: First, is Debra Brooks a deprived child? Second, are Jimmy and Mary Ann Brooks 'unfit' parents; and, third, should their parental rights be severed?

"Obviously, without having a complete transcript of the prior hearing on this matter, I must consider what the prior court actions were in this case and couple that with evidence presented at the March 8 hearing here in Wyandotte County.

"In order to sever parental rights the State must show the parents are 'unfit' to act as parents. The burden of proof on the State to establish unfitness is high. I will not permanently deprive a natural parent of the custody of a minor child unless the parents' unfitness is established by clear and convincing evidence. 'Unfit' has been defined as meaning, in general, 'unsuitable, incompetent or not adapted for a particular use or service'.

. . . .

"In the case of In re Armentrout, 207 Kan. 366, pp. 371-72 the Supreme Court has defined 'unfit' as 'unsuitable, incompetent or not adapted for a particular use or service'.

"In this case it is important to look at the entire picture surrounding the Brooks family. The States' witnesses included two psychologists and three social workers, one experienced in special education. All of the States' witnesses dealt with one or all of the Brooks family members.

"In summary the witnesses testified as follows:

"First; Phyllis Jeter, social worker in Pittsburg, Kansas Office of SRS, testified of her involvement with the Brooks family since March, 1978. State Exhibit #1 is a summary of her findings, and was received into evidence without objection. Ms. Jeter testified about coordinating 2 or 3 visits between Mr. and Mrs. Brooks and Debra. She stated the Brooks appear to be highly motivated and sincere, caring persons who are of limited ability and who lack understanding of everyday life

and its ramifications. Many problems were noted with the visit itself, and Ms. Jeter concludes it would be her recommendation to terminate parental rights.

"Second; Margaret Brohl, psychologist at Crawford County Mental Health Center, testified she has worked with Mr. and Mrs. Brooks in the area of counseling and instruction in parenting techniques. The course in parenting was covered in 12 sessions and there was no need for more sessions. She feels the Brooks could be parents for a normal child with proper supportive services. She stated it would be difficult for them to care for a child requiring special services. Ms. Brohl's testimony was summarized in State's Exhibit #2, which was received without objection.

"Third; Dr. Mary Mira, Associate Professor of Pediatrics, Psychology at the Children's Rehabilitation Unit, University of Kansas Medical Center, testified she evaluated Mr. and Mrs. Brooks and Debra as to the Brooks' ability to be proper parents for Debra. Her report was received into evidence and marked State's Exhibit #3.

"Dr. Mira found the Brooks to be eager and happy persons. Their interaction with Debra was positive, warm, but inappropriate. She felt that Debra is a high risk for mental retardation, and she needs an extremely structured home environment which the Brooks can't provide at this time. Dr. Mira stated the Brooks weren't hostile or abusive, but they lack the ability to understand the child's limits. Debra is evaluated as an overactive, inattentive, compliant child who is approximately 6 months delayed in skill level. She is a microcephalic (small head) child and this creates a high risk for mental retardation.

"Fourth; LeAnne Britten, Special Education Instructor at Shawnee Mission Medical Center, Infant Development Unit, testified of her contact with Debra since September, 1978. She testified Debra is in a special education, highly structured class because she was difficult to control in a regular preschool class. Ms. Britten stated Debra is not doing as well as the staff had hoped, and there is a concern about Debra being a high risk for later mental problems. She indicated the foster parents are dealing with Debra's problem of control.

"Fifth; Yvonne Lindsey, SRS Foster Care Worker, has monitored the Brooks visits with Debra. She stated they were hectic, as Debra is quick in her movements and can get out of hand quickly. She stated she saw no physical abuse by the Brooks.

"Sixth; Mary Ann Brooks, mother to Debra, testified that Jimmy Brooks is not the natural father of Debra Brooks; but, that James Brooks, Sr., is the natural father of Debra. She testified James Brooks, Sr., told her and acknowledged that he is the father to Debra. She further stated he has not supported Debra in the past.

"In this case what we have is a 4-year-old child who has spent almost no time in the custody of her parents, due largely to the inability of the parents to properly care for the child and also due partly to the child's special problems.

"I believe the law clearly protects children from foreseeable abuse or neglect. I believe a deprived finding can be made if the natural foreseeable consequence of the parents' custody over the child would be abuse or neglect.

"In this case I am convinced from the evidence presented that Debra Brooks would be a neglected child if custody would be returned to the natural mother and father, as I feel the evidence is clear these parents could not provide the proper parental care or control necessary for this child's special physical, mental or emotional health needs.

"I further find that James Brooks, Sr., is the natural father of Debra Brooks. I find that he has failed to provide any parental care or control over Debra, and he has in fact abandoned this child by his lack of providing any financial or parental aid to Debra. Service by publication is approved, and James Brooks, Sr., is found to be an unfit person to continue as a parent and I am permanently severing his parental rights as to Debra Brooks. There is a presumption that when two parties are married any children of that marriage are presumed to be children from the marriage partners. This presumption can be overcome by other testimony as in this case where the biological mother, Mary Ann Brooks, has testified under oath that her marriage partner is not the biological father of her child. Mrs. Brooks' testimony is undisputed by any other evidence and therefore controls my decision as to James Brooks, Sr.

"The last question and of course the most difficult question to be answered is, has the State proven by clear and convincing evidence that Mary Ann Brooks and/or Jimmy are unfit persons to continue as parents of Debra Brooks. In reaching a determination the Court must consider the rights of the parents and also the rights of Debra Brooks. The ultimate decision must also consider what is in the best interest of the child.

"Testimony from the witnesses in this case indicates to me that while the Brooks are persons eager to become parents [and] who have the proper attitude to be parents, they lack the mental and emotional capacity to appreciate and perform the obligations that come with being a parent. While they feel they have the ability to be proper parents, I am convinced from the evidence presented that Debra Brooks would present child rearing problems beyond the Brooks' capacity to handle. The testimony of Dr. Mira, Ms. Lindsey and Ms. Jeter has convinced me that in this case when considering all factors, I can regretfully reach only one conclusion and that is that the Brooks are 'unfit' persons to remain as parents for Debra Brooks, and that it is in the best interest of Debra Brooks that their parental rights are permanently severed and that Debra be placed in the full legal and physical custody of SRS for adoption.

"This decision is not taken lightly and it is made after thoroughly reviewing the complete file several times. I have also considered other possible alternatives, none of which are reasonable in this case. I am firmly convinced that in the long run Mr. and Mrs. Brooks will see the wisdom of my decision. I have a great deal of sympathy for the parties involved. This child has been in foster care for four (4) years and it is time to give her a chance to begin a new life with a family who can give her the proper parental care a special child like her is sure to need in future years. This child needs dedicated parents who can give her maximum emotional and mental guidance coupled with love and affection; these qualities her natural parents are unable to provide.

"The parties are reminded of the right to expungement of the charge when applicable. Costs of this action including attorney fees and publication costs are taxed against the county."

To facilitate understanding of the child's condition, the following is reproduced verbatim from Dr. Mira's testimony:

"I tried to assess her from two standpoints; one, the behavior that she demonstrated during the testing and what we know about her physically. We know that

this is a child who is high risk for mental retardation, this is a child who is microcephalic and we know that this is associated with later problems of retardation and neurological problems in 90% of the cases so on the basis of her systemic findings we know she is a high risk child. I found her to be delayed, approximately six months delayed in her skill levels. More than that I found her to be a child who I would characterize as overactive, inattentive; I needed to use all of my skills as a behavior manager to keep her on task. She's a child who required a great deal of skill in management. I would see her as a child who is as I said developmentally with some problems with some attention and behavior problems and very high risk for later learning problems."

Although not specifically mentioned by the trial court, the evidence leads to the conclusion that Mary Ann has a rather idealized concept of motherhood and does not comprehend the day-to-day difficulties encountered in raising a child with the behavioral problems possessed by Debra. The evidence speaks to concern over the effects the appellants would have on the child, but a legitimate concern is inherent in the evidence as to the effect the presence of a highly disruptive child would have on the appellants' ability to function.

The Kansas case most closely resembling the factual situation herein is *In re Penn,* 2 Kan. App. 2d 623, 585 P.2d 1072 (1978), wherein the Kansas Court of Appeals stated at 624-625:

"Efforts to help the Penns improve their parenting skills and alter their manner of relating to Kathy have been futile and the prognosis for improvement in this area is poor. One of the problems is that the Penns themselves do not have the emotional stability to meet Kathy's needs. They deny that she has any problems and even after therapy lack insight into how Kathy's behaviors developed and how they might deal with them in the future. Although the professionals who have successfully treated Kathy testified during the hearing that it is mandatory for Kathy to have a consistent, structured environment if she is to attain normal growth and development, the Penns resist changing their method of child rearing which is too unstructured, nondirective and passive for a child of Kathy's nervous, insecure disposition. Even when compelled by external agencies the Penns find it extremely difficult, if not impossible, to make demands upon Kathy. They persist in believing that all they need to do is to take Kathy back home and love her and everything will be all right.

"It is difficult to envision a home situation which would be more detrimental to a child with Kathy's particular needs. In so saying, we do not imply that we will disturb a normal family relation merely because others may be better able to give the child greater comforts, wider education or the promise of a larger inheritance. See *In re Vallimont,* 182 Kan. 334, Syl. ¶ 3, 321 P.2d 190 (1958). Nor do we discount the value of love and affection, which the Penns seem willing to give Kathy within the limits of their capacity. However, love alone is not sufficient. *Lennon v. State,* 193 Kan. 685, 690-691, 396 P.2d 290 (1964). The psychological

and emotional health of a child is no less a concern of this court than is the physical care."

It should be noted that the facts of *Penn* present a more severe situation than is present herein, but much of the rationale is applicable.

The trial court was confronted with a most difficult factual situation and obviously reached its decision with sensitivity and concern. After careful consideration the trial court held the appellants to be unfit to be the parents of Debra and terminated their parental rights. The decision was supported by clear and convincing evidence and no error is shown.

The judgment is affirmed.