NOT DESIGNATED FOR PUBLICATION

No. 127,565

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of X.W.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Mitchell District Court; KIM W. CUDNEY, judge. Submitted without oral argument. Opinion filed September 20, 2024. Affirmed.

*Timothy J. Demel*, of Harrison & Demel Law Office, LLC, of Beloit, for appellant natural father.

*Mark J. Noah*, county attorney, *Katie J. Schroeder*, guardian ad litem, of Schroeder Law Office, LLC, of Beloit, and *James M. Johnson*, for maternal grandparents, of Frasier, Johnson, & Martin, LLC, of Beloit, for appellees.

Before ARNOLD-BURGER, C.J., GREEN and COBLE, JJ.

PER CURIAM: In March 2024, the Mitchell County District Court terminated Father's parental rights to X.W. and found adoption to be in her best interests. Father now appeals, arguing termination of his parental rights was not in the best interests of X.W. because the court overlooked other permanency options. After review, we affirm the district court's termination of Father's parental rights.

FACTUAL AND PROCEDURAL HISTORY

Mother and Father married just before X.W. was born in 2012. Mother successfully petitioned for an annulment from Father just a few months later, which the

1

district court granted by default judgment The annulment decree specified Mother would have sole legal custody of X.W., with any visitation by Father at Mother's sole discretion.

Father has been incarcerated for most of X.W.'s life and thus has had little to no contact with her and provided no financial or parental support. Shortly after X.W. was born, Father began serving an 18-month prison sentence, stemming from convictions for burglary, theft, and criminal possession of a firearm by a felon. Following that prison stint, Father committed more crimes—including aggravated burglary, aggravated and simple robbery, kidnapping, and aggravated assault—and in 2016 began serving a prison sentence with an expected release date of 2044. See *State v. Williams*, 117,256, 2018 WL 2375784 (2018).

Mother developed a serious medical condition. In January 2023, when she realized her health was deteriorating, Mother initiated contact with Father. Father began exchanging messages and phone calls with X.W. and Mother for a few months. Then in May 2023, Mother died. The State promptly filed a petition alleging X.W. was a child in need of care (CINC) because her only surviving parent could not provide parental care due to his incarceration. X.W. and her half-brother were placed with X.W.'s Maternal Grandparents. In July 2023, X.W. was adjudicated a CINC.

In September 2023, the district court held a disposition and permanency hearing, finding that reintegration with Father was not viable, changed the case plan to "either adoption or permanent custodianship," and directed the State to move for termination of parental rights. Later, the State filed a motion requesting the court to "find the Father of the above-named child to be unfit and terminate parental rights, and/or to appoint a permanent custodian."

Father opposed the termination of his parental rights and argued termination was not in X.W.'s best interests. He revealed that he wished to maintain a relationship with

her and would consent to other permanency options that allowed him to keep his rights intact. The State argued termination was appropriate because Father had been incarcerated for most of X.W.'s life and had failed to provide parental support in any way. The State also asserted Father's convictions made him presumptively unfit under K.S.A. 38-2271(a)(2), and it further argued that subsections K.S.A. 38-2271(b)(8), (9), (11), and (13) applied. As for the termination decision, the State asserted termination was in X.W.'s best interests because "[X.W.] does not know the Father. He has never been there for her. If he were to pass away today, his estate would consist of nothing. No money, no property, [and] no precious memories." In contrast, the State asserted adoption was appropriate because

"Maternal Grandparents are successfully retired and have a comfortable lifestyle. They are more than able to care for [X.W.] and provide for all of her needs. In addition, she has the benefit of many aunts, uncles and cousins. This is a family that will benefit [X.W.] and the family will benefit by her. She has a bright promising future with them."

The district court held the hearing on the State's motion for termination in February 2024, during which testimony was provided by a St. Francis Ministries (SFM) employee assigned to the case, Maternal Grandfather (Grandfather), Father, and a therapist who worked with Father in prison. The court also admitted several exhibits into evidence, including court records from Father's numerous criminal cases, Father's lengthy history of disciplinary reports from his time in prison, and copies of the messages exchanged between Father and X.W. before the CINC proceedings.

Testimony presented at the hearing established that Father's relationship with X.W. was "pretty absent." X.W. was aware of Father's incarceration and his release date, and she was not actively asking to see him or have contact with him. Father had only sent two letters to X.W. since the proceedings were initiated nine months earlier. The most recent letter was about two weeks before the termination hearing and it contained

3

inappropriate discussion about the relationship between Maternal Grandparents and Mother. X.W. indicated that she wanted to be adopted by her Maternal Grandparents.

SFM and the Kansas Department for Children and Families (DCF) supported terminating Father's parental rights and placing X.W. for adoption by Maternal Grandparents. Although it was acknowledged that X.W.'s day-to-day life would be similar under either adoption or a permanent custodianship, the agencies considered adoption preferable. X.W. would receive certain benefits—such as a medical card and an adoption subsidy—through adoption that would not be available under a permanent custodianship. These benefits would help Maternal Grandparents provide for her and were not available under a permanent custodianship. Besides having no contact with X.W. for all but a few months of her life, Father provided no financial assistance, nor has he ever provided any financial assistance toward X.W.'s care. They believed that Father's parental rights should be terminated because he could not provide for X.W. in a financial or parenting capacity.

Maternal Grandparents had been involved in X.W.'s life since birth, and they even had obtained temporary custody of X.W. at one point while Mother was in a rehabilitation facility. Maternal Grandparents wanted to adopt X.W. to "give [her] a better life than [she'd] ever had." They had the ability and financial means to take care of X.W. because they were both retired and lived near extended family who had offered to help as well.

Although Maternal Grandparents were unaware of the contents and extent of communication between X.W. and her Father during the last few months of Mother's life, X.W. had only asked about Father a few times, including once when they went to clean Mother's apartment. While cleaning out Mother's apartment, X.W. wanted to keep a picture that Father had drawn of her, so Grandfather allowed X.W. to retrieve it from her bedroom. X.W. revealed to Grandfather that Father was "really trying to make himself

4

better" and tried to get X.W. "to talk Mom into sending him some money so he can buy books to get an education." X.W. also retrieved Mother's phone in case Father tried to reach out.

Given Father's absence from X.W.'s life, Maternal Grandparents suggested they would not encourage additional contact with Father because they did not believe he had anything to offer "as far as nurturing her to become . . . a good person . . . with morals and values." They were skeptical that Father could "change" and believed that "what speaks the loudest is leadership by example." Yet Grandfather admitted he was unaware of the contents of the messages between Father and X.W. in the months preceding Mother's death and was surprised to learn about their existence. Those communications effectively ended after Mother's death.

A licensed clinical social worker from the Lansing Correctional Facility worked with Father during the time he had started communicating with X.W. They discussed his relationship with X.W., particularly related to parenting and coparenting. Father knew that his parenting ability was limited because of his incarceration but he still "wanted to do what was in the best interests for [X.W.]," which he believed meant maintaining their relationship. The social worker opined that keeping Father in X.W.'s life "will be the best possible outcome for her." Yet she admitted she never met with X.W. or Mother.

Father was not employed in prison. He acknowledged the lengthy list of disciplinary actions taken against him while in prison—116 in total—which all occurred before he began communicating with X.W.

Father discussed the contents of some of his messages with X.W., which included her daily activities and school, as well as their shared musical interests. Father also discussed his messages with Mother, which touched on reestablishing contact with X.W. and being there for her, as well as acknowledging the milestones Father had missed out

5

on. Father believed that Mother's messages indicated she wanted him to have a relationship with X.W.

Father acknowledged he was around only "off and on" during the first three years of X.W.'s life because of his incarceration. Father believed X.W.'s current placement was safe and healthy "[t]o some degree." But he wanted the court to allow him to continue developing a relationship with X.W. going forward. Father said he "was there from the beginning" and "every chance and opportunity that presented itself for me to take care of my parental obligations, . . . I stepped up to the plate willingly . . . and will continue to do so."

That said, Father explained that he did not list X.W. as a dependent on his financial affidavits in his criminal cases because he and Mother were not living together at the time those were completed. He also acknowledged his annulment from Mother occurred in February 2013—just six months after X.W.'s birth and while he was in prison on his previous cases. After his release, Father did not return to living with Mother and X.W. at any point. Near the end of his testimony, Father stated that he did not want to "force" a relationship on X.W. and that he would "respect" X.W.'s wishes so long as "it was authentically and genuinely her words and her feelings" to not continue their relationship.

The district court found there was clear and convincing evidence of Father's unfitness and that terminating his parental rights was in the best interests of X.W. The court noted Father did not dispute that his incarceration was a significant factor in his unfitness. As for whether to terminate Father's parental rights, the court's primary concern was establishing permanency for X.W. The court explained that Father's love for X.W. and his willingness to "hang onto the thinnest thread of a connection that you have with her" is "admirable," but that his circumstances made him unable to provide emotional or physical support. Thus, the court said it would be best for X.W. to be adopted by

Maternal Grandparents because she deserved "to have a life of permanency. To know where she will be. To know that a permanent custodianship will not be undone."

Father timely appeals.

ANALYSIS

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). But this fundamental right to parent is not without limits. 312 Kan. at 778. Because child welfare is a matter of state concern, the State can intervene to assert its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

Before terminating a person's parental rights, a district court must find the State has proven by clear and convincing evidence that the parent is unfit and that the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future, and by a preponderance of the evidence that termination of parental rights is in the best interests of the child. K.S.A. 38-2269(a), (g); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶¶ 1, 2, 336 P.3d 903 (2014).

Here, the district court found the evidence supported a finding of Father's unfitness under K.S.A. 38-2269(b)(5) (conviction of a felony and imprisonment) and K.S.A. 38-2269(b)(8) (lack of effort by the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child). Father does not challenge that unfitness ruling. Instead, he focuses his argument on whether there was sufficient evidence to establish

7

that it was in X.W.'s best interests to have Father's parental rights terminated, rather than order a permanent custodianship.

In making a best interests determination, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 38-2269(g)(1). This decision rests within the sound discretion of the district court, which makes the decision based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. Consequently, we review the district court's best interests finding for an abuse of discretion. 50 Kan. App. 2d at 1115-16. A district court exceeds its discretion if its ruling stems from an error of law or fact or is "arbitrary, fanciful, or unreasonable." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). Father does not point to a legal or factual error, so the question becomes whether no reasonable person would reach the same conclusion as the district court. *In re R.S.*, 50 Kan. App. 2d at 1116.

Typically, when making a termination decision,

> "the court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

As Father notes, this court has said a district court must find that "under no reasonable circumstances can the welfare of the child be served by continuation of the parent-child relationship" before making the decision to terminate parental rights. *In re Atwood*, 2 Kan. App. 2d 680, 681, 587 P.2d 1 (1978). The Kansas Supreme Court, however, has since clarified that a court is only required to consider alternatives to

8

termination if an interested party raised such alternatives at trial. *In re Brooks*, 228 Kan. 541, 551, 618 P.2d 814 (1980). Instead, the court imposed a modified test:

> "The court should carefully consider any particular alternative remedy proposed by an interested party in the case, and if rejected the court should state its reasons for such rejection. The drastic remedy of termination of parental rights should not be utilized unless the court is satisfied there is no realistic alternative and so finds." 228 Kan. at 551.

So the question turns to whether the district court correctly found that termination of Father's parental rights was in X.W.'s best interests. See K.S.A. 38-2269(g)(1). Father argues the district court abused its discretion by failing to consider other permanency options, such as whether to appoint a permanent custodian without terminating his parental rights. He also argues the court's best interests finding was not consistent with the evidence presented and the court's other findings. We disagree.

In its written order, the district court correctly noted that Father's only involvement in X.W.'s life was a few months after she was born and then some consistent contact for a few months right before the CINC proceedings.

> "The Father cannot provide emotional or physical support for [X.W.].
> "It is best for [X.W.] to be with her Maternal Grandparents as a family.
> "[X.W.] has a right to have a life and permanency and to know where she will be.
> "[X.W.] needs to be protected from the Father who has not been there for her."

The district court expanded on these findings at the termination hearing, explaining the importance of X.W.'s "rights to have a life of permanency. To know where she will be. To know that a permanent custodianship will not be undone. That she may be adopted [by Maternal Grandparents]." The court further explained:

"[X.W.] will always know who you are. And when she's an adult, she can make that choice.

"But until then, she needs to be protected from the father who has himself in a bad situation for a long period of time in prison.

"Who hasn't shown us the greatest support for his child. Either physically or by, by support, by emotion.

"And you have a long, long history of disciplinary reports. What does that tell her?"

Based on these findings, the district court found termination was in X.W.'s best interests for two reasons: (1) to "protect[]" X.W. from Father while he is in prison; and (2) because an adoption would be more permanent. These findings are supported by the record.

To support its first finding that adoption would protect X.W. while Father was in prison, the district court pointed out that Father had only communicated twice with X.W. after this case was initiated, the last of which was inappropriate in discussing his relationship with Mother. The evidence revealed that in the letter, Father told T.W. how Maternal Grandparents had disowned Mother and were not supportive of X.W.'s birth. The danger of such a communication is evident, and it was not unreasonable for the district court to conclude that this could endanger X.W. Regardless of whether Maternal Grandparents were allowed to adopt X.W. or simply be permanent custodians, letters such as this would foment distrust and perhaps hatred of the only stable parental figures in X.W.'s life. The district court presented a compelling case that based on Father's criminal behavior, including multiple disciplinary reports while in prison, and his lack of any contact with X.W. during her lifetime, he would be a bad influence on X.W.—from which she deserved the court's protection.

The second factor relied upon—that adoption would provide more permanency to X.W—was also supported by the evidence and not unreasonable.

10

First, Father had never, nor could he, provide financial support to X.W. If the court were to bypass adoption and grant a permanent custodianship, X.W. would no longer be eligible for an adoption subsidy or a medical card. Although Maternal Grandparents had adequate financial resources to care for X.W., such benefits—when Father was providing no support—would enhance the family income available to care for X.W.

Second, the district court found that an adoption would be more permanent because it could not be "undone" as easily. Although Father challenges the evidentiary support for such a finding, a review of the statutes helps provide context for the judge's statement.

Kansas law only allows appointment of a permanent custodian in these circumstances:

"(1) With the consent and agreement of the parents and approval by the court;
"(2) after a finding of unfitness pursuant to K.S.A. 38-2269, and amendments thereto; or
"(3) after termination of parental rights pursuant to K.S.A. 38-2270, and amendments thereto." K.S.A. 38-2272(a).

That statute further describes how the parental rights of a biological parent and a permanent custodian will be shared. As a baseline, "a permanent custodian shall stand in loco parentis and shall exercise all of the rights and responsibilities of a parent except the permanent custodian shall not:  (1) Consent to an adoption of the child; and (2) be subject to court ordered child support or medical support." K.S.A. 38-2272(c). Under subsection (d) the court has the authority to "impose limitations or conditions upon the rights and responsibilities of the permanent custodian," including the permanent custodian's right to "[d]etermine contact with the biological parent." K.S.A. 38-2272(d)(1). Subsection (e) further provides that "[*a*]*bsent a judicial finding of unfitness* or court-ordered limitations

pursuant to subsection (d), a permanent custodian may share parental responsibilities with a parent of the child as the permanent custodian determines is in the child's best interests." (Emphasis added.) K.S.A. 38-2272(e).

So the establishment of a permanent custodianship opens the door to further judicial action regarding the biological parent's interaction with the child. Father could unequivocally thwart any adoption by the Maternal Grandparents in the future. So just as adoption closes the door to permanent custodianship, permanent custodianship could close the door to a future adoption, even if that may be in X.W.'s best interest. And second, it allows the court to continue to have jurisdiction to decide whether Father has a right to continued contact with X.W. A future court could order that Father should be able to continue to write letters to X.W. from prison, perhaps without due regard for the impact such letters may have on X.W.'s relationship with the permanent custodian, her Maternal Grandparents. By instead ordering adoption, what has been ordered cannot be undone.

Father calls our attention to *In re T.H.*, 60 Kan. App. 2d 536, 494 P.3d 851 (2021), to support his claim that his incarceration is not enough to find that termination of his parental rights rather than a permanent custodianship was in X.W.'s best interests. While that case also involved a decision to terminate the parental rights of an incarcerated father, the court found an abuse of discretion on the district court's part in basing its termination decision solely on the father's incarceration and an "arbitrary" one-year timeline for permanency. 60 Kan. App. 2d at 559-62. We find Father's reliance on T.H. misplaced. The involvement of the father in T.H.'s life was significantly and materially different than Father's involvement here.

T.H.'s father was involved in T.H.'s life from birth. He shared custody with mother and in fact took full custody of T.H. during times in T.H.'s life when mother caused injury to T.H. or otherwise placed him in danger. He provided full financial support for

T.H. He had a deep and lifelong bond with T.H. And although he committed a crime that required his incarceration for five years, he set aside money to provide for T.H.'s needs during that time and arranged for a friend that was well known and liked by T.H. to care for him. There was no indication, but for T.H.'s planned incarceration period, that father was unfit to care for T.H. before or after his incarceration. The State repeatedly assured father that it would agree to a permanent custodianship with father's friend, who it had declared a viable placement option. Yet, after father's incarceration, and with no warning or rationale provided for its change of plans, it placed T.H. with his grandparents for adoption and abandoned any support for a permanent custodianship. We found such an action to be an abuse of discretion.

Here, but for the five months of Mother's illness, Father had no real contact with X.W. during her lifetime. He provided no financial support. There was no indication of a deep bond with X.W. And while T.H. would still be a child when his father was released from custody, here Father will not be released until X. W. is over 30 years old.

Father recognizes that he presently has no significant relationship with his child. Father also admits his incarceration makes it impossible for him to parent X.W. in person. Although he asserts a permanent custodianship was a viable option, we do not find the district court's decision denying that request to be unreasonable.

Affirmed.