NOT DESIGNATED FOR PUBLICATION

No. 116,391

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of:
A.M. (D/O/B XX-XX-11),
E.M. (D/O/B XX-XX-07).


MEMORANDUM OPINION


Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed May 12, 2017. Reversed and remanded with directions.


*Richard P. Klein*, of Olathe, for appellant.


*Bruce Hedrick*, guardian ad litem, *Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.


Before GARDNER, P.J., PIERRON and ATCHESON, JJ.


*Per Curiam*:  As a society, we have chosen to place an exceptionally high value on the parent-child relationship and countenance government intrusion in that relationship only in compelling circumstances. We are even less willing to allow the State to irrevocably sever the legal ties affirming the blood-bond of parent and child. Accordingly, courts have the authority to terminate the parental rights of only those persons found to be irredeemably unfit to care for their children—nothing less will suffice. So a court may not strip the below average and even the poor parent of that role in deference to someone who almost certainly would do better. The Johnson County District Court's decision to terminate the right of B.C. to raise his daughters A.M. and E.M. tests those societal values and legal precepts. Measured that way, the record

1

evidence fails to show B.C. to be chronically unfit. We, therefore, reverse the termination of B.C.'s parental rights and remand with directions for further proceedings.

*Common Law and Statutory Framework*

Parents have a fundamental right to raise their children. *Santosky v. Kramer*, 455 U.S. 745, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Protection for that relationship has roots in natural law and religious teachings, and the right represents the archetype substantive liberty interest shielded in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest) (plurality opinion); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control"); 67A C.J.S., Parent and Child § 3 (noting judicial authority characterizing parent-child relationship as reflecting "natural law and divine providence"). The State may extinguish the legal relationship between parent and child only upon clear and convincing evidence the parent is "unfit" and likely will remain so indefinitely. K.S.A. 2016 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014); see *Santosky*, 455 U.S. at 769-70 (due process mandates government produce clear and convincing evidence supporting termination of parental rights).

In this case, B.C. challenges the sufficiency of the evidence the district court relied on to terminate his parental rights. When reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record viewed in a light favoring the State as the prevailing party, that a rational factfinder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed

2

questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit and against B.C.

As provided in K.S.A. 2016 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2016 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2016 Supp. 38-2269(c). Those factors may be illustrative of parental unfitness, but the Revised Kansas Code for Care of Children, K.S.A. 2016 Supp. 38-2201 *et seq.*, contains no formal definition of the term. The Kansas Supreme Court surveyed cases discussing unfitness in termination proceedings and indicated it entails unsuitability and incompetence, often coupled with some moral dereliction. *In re Brooks*, 228 Kan. 541, 546-47, 618 P.2d 814 (1980). This court has equated unfitness with the "incapacity to perform parental obligations." *In re A.N.P.*, 23 Kan. App. 2d 686, 692, 934 P.2d 995 (1997); see *In re Adoption of A.M.M.*, No. 109,247 2013 WL 5507483, at *5 (Kan. App. 2013) (unpublished opinion), *rev. denied* 298 Kan. 1202 (2014); *In re Baby Girl E.*, No. 103,740 2010 WL 4668356, at *4 (Kan. App. 2010) (unpublished opinion), *rev. denied* 291 Kan. 912 (2011).

Taking full account of those substantive legal principles and the governing standard of review, we have examined the district court's conclusions that B.C. was unfit to parent A.M. and E.M. and that the familial circumstances were unlikely to change in any predictable time. We find the evidence failed to support those determinations for the reasons we explain. Before turning to that explanation, we mention the district court also found the termination of B.C.'s parental rights to be in the best interests of A.M. and E.M. Having found a parent to be unfit, a district court must then make a best-interests determination to warrant terminating parental rights. K.S.A. 2016 Supp. 38-2269(g); *In re*

*R.S.*, 50 Kan. App. 2d at 1115-16. Because we hold the district court's assessment of unfitness to be erroneous and that alone requires reversal, we need not and do not otherwise address the best-interests finding.

*Factual and Procedural Background*

B.C. never married the mother of A.M. and E.M., and so far as the record indicates, they had an on-again, off-again relationship. B.C. did not even know about A.M. until months after her birth. B.C. had physical custody of both girls for some time before these proceedings began. Their mother was either unable or unwilling to care for them. In this case, she voluntarily relinquished her parental rights and did not actively participate in the district court proceedings. She is not a party to this appeal.

The State filed petitions to find A.M. and E.M. children in need of care in April 2014. They were immediately placed in State custody and were formally adjudged in need of care in August 2014. At the time of the adjudication, E.M. was 7 years old and A.M. was 3 years old. B.C. also had physical custody of A.C., their half-sister.[1]

[1]The proceedings involving A.M. and E.M. were immediately consolidated. A.C. was not named as a child in need of care in this case. The record, therefore, is sketchy about her status and whereabouts. We may reasonably infer B.C. no longer had custody of A.C. as this case progressed. But anything more about A.C.'s legal situation would be speculation.

B.C. and the three children apparently were staying with his mother in 2013. B.C.'s 14-year-old half-brother D.P. also lived there. D.P. sexually assaulted E.M., prompting a State investigation and the entry of an order prohibiting D.P. from having any contact with the children. B.C. moved in with his then-girlfriend, taking E.M. and A.C. with him. A.M. apparently resided with B.C. some of the time and with her paternal grandmother some of the time, in violation of the no-contact order. In addition, B.C. took the girls to a party at their grandmother's house on St. Patrick's Day purportedly while

4

D.P. was there, which also would have violated the no-contact order. State authorities became aware of those circumstances, prompting the filing of the petitions in this case and the removal of A.M. and E.M. from B.C.'s custody. B.C. has consistently disputed that D.P. was present at the party. In its memorandum decision terminating B.C.'s rights, the district court made no findings regarding the specific violations of the no-contact order. During the termination hearing, everyone acknowledged that D.P. sexually abused E.M. and had admitted doing so.

In August 2014, the district court put in place a reintegration plan and extended the plan several times. Over the course of the proceedings, B.C. had three case managers overseeing the reintegration efforts. A.M. and E.M. lived together in a foster placement and regularly attended therapy sessions with a licensed clinical social worker. B.C. held fulltime employment in semiskilled, hourly wage positions throughout the case. He switched employers to take a job with a schedule more conducive to parenting the girls by freeing more of his time before and after school.

Finding housing conforming to the reintegration plan proved particularly challenging for B.C. Initially, he leased a 2-bedroom apartment with the expectation A.M. and E.M. would share a bedroom, A.C. would take the second bedroom, and he would sleep on a sofa in the living room. The assigned case manager approved the arrangement. During that time, B.C. had supervised and unsupervised visits with A.M. and E.M. that appeared to be going well. The case manager anticipated B.C. would soon be allowed fulltime physical custody of the girls, subject to continued monitoring under the reintegration plan.

In the meantime, the foster placement reported that E.M. had touched A.M. in a sexually inappropriate way at least twice. Those incidents occurred at the foster placement's home. The social worker addressed the issue with the children during their therapy sessions. And the case manager informed B.C. he would need to get a 3-bedroom

5

residence because the girls could not share a bedroom. B.C. leased a suitable apartment in Johnson County, but the cost wound up straining his income. He moved out after about 5 months, breaking the lease in what amounted to an eviction. With depleted finances and a spotty record as a tenant—he had been evicted from another apartment years earlier—B.C. had a difficult time finding another place. He lived with either of two friends or with his mother as he saved money to rent acceptable housing.

At the termination hearing, B.C. testified that he had put a deposit down on a mobile home in rural Johnson County only to decide it was too rundown for the children. Later, a landlord was willing to rent him a house in Wyandotte County, but B.C. considered the neighborhood to be bad, so he lost an initial deposit. The weekend before the termination hearing, B.C. signed a lease for a 3-bedroom apartment in Leavenworth County, close to where A.M. and E.M attended school. His assigned caseworker, however, had not been able to inspect the apartment to determine its suitability.

During that same period, B.C.'s contact with A.M and E.M. was curtailed and, then, at the request of the social worker, cut off. After an unsupervised visit, the girls reported to the foster placement that B.C. and his mother (their grandmother) had argued loudly with each other. The reason for the argument was subject to conflicting evidence, but the children were indisputably upset by the confrontation. The case manager told B.C. that his mother could no longer participate in visits with A.M. and E.M. without specific approval. Not long after, B.C.'s mother briefly joined him and the children at an ice cream parlor. After learning of that unapproved visit, the case manager cancelled further unsupervised visitation between B.C. and his daughters. So B.C. had to meet with A.M. and E.M. in a designated room at the case manager's office. Those visits were often a struggle with the girls running up and down the hallways in the building, yelling, throwing toys, and otherwise acting out. According to the case manager, B.C. was unable to effectively rein in and redirect his daughters' unruly behavior. The unruliness often spilled over to adversely affect the girls' behavior at school the day after the visits. The

6

social worker ultimately recommended all visitation between B.C. and his daughters cease. So B.C. had no contact with the children for about 2 months leading up to the termination hearing in April 2016.

A.M. and E.M. sometimes acted out at the home of their foster placement, although those episodes decreased over time. The evidence indicated the girls liked their father and looked forward to seeing him. Their foster placement testified at the termination hearing that E.M. often inquired about when she would next see her father or mother and occasionally asked, "When am I going home?" E.M. also expressed uneasiness about where she would wind up living on a permanent basis, according to the foster placement. A.M., the younger child, did not voice similar questions or concerns.

*District Court's Decision to Terminate B.C.'s Parental Rights*

In its memorandum decision, the district court cited three statutory grounds in finding B.C. to be an unfit parent: Failure of reasonable efforts to rehabilitate the family, K.S.A. 2016 Supp. 38-2269(b)(7); B.C.'s "lack of effort" to adjust his circumstances to meet the children's needs, K.S.A. 2016 Supp. 38-2269(b)(8); and failure to carry out a reintegration plan, K.S.A. 2016 Supp. 38-2269(c)(3). As we indicated, the governing statute provides a smorgasbord of factors establishing unfitness. Those the district court cited overlap insofar as they deal with the comparative failure of resuscitative efforts rather than with a deleterious aspect of the parent's status or behavior predating judicial intervention, *e.g.*, serious mental instability, chronic drug abuse, or continuing neglect or mistreatment of the child. The district court essentially relied on the same constellation of facts to support each of those statutory grounds. That is, the district court recycled its rendition of the record evidence to support unfitness on multiple statutory bases, resulting in a legal redundancy resting on a single set of factual determinations. So each of the legal reasons rises or falls on the same evidence. What the district court outlined in its memorandum decision fails as a factual predicate for the legal conclusion of unfitness,

7

especially given the heightened evidentiary standard for terminating parental rights. We now review those shortcomings and ultimately conclude that a reasonable factfinder could not say the evidence demonstrates "a high probability" that B.C. was an unfit parent.

The district court repeatedly characterized B.C. as "homeless" and found any likely change in that circumstance to be "unknown." That, however, amounts to a material mischaracterization of the evidence. Although B.C. went for nearly a year without a residence meeting the requirements for regaining custody of A.M. and E.M., he was never homeless in any common understanding of the term. Homelessness implies the lack of a permanent and conventional place to live—surviving on the street, in a car, or at a shelter. B.C. was always gainfully employed and shared a residence with others. He was, in a word, a roommate. Being a roommate, however, would not accomplish family reintegration, something B.C. plainly recognized and worked to fix. He repeatedly endeavored to rent suitable housing with only limited success. But at the time of the termination hearing, B.C. had leased a 3-bedroom residence. The case manager could have promptly inspected the premises, an assessment that would not have substantially delayed the case. The district court misapprehended the record evidence and erred in basing B.C.'s purported unfitness on inadequate living arrangements that were unlikely to change in the foreseeable future.

In its memorandum decision, the district court repeatedly castigated B.C. for failing to contact the social worker after she recommended terminating all visitation with A.M. and E.M. The district court seemed to view that failure as reflecting a lack of genuine desire on B.C.'s part to parent his daughters. But the conclusion is wholly unwarranted. B.C. was never integrated into the therapy sessions the social worker had with A.M. and E.M. He was not invited to participate in them and did not. The social worker did not communicate with B.C. about those sessions or particular issues A.M. or E.M. might be dealing with. Rather, the social worker reported to the case manager. So

B.C. would have stepped out of the established bureaucratic pattern to communicate directly with the social worker. And B.C. testified that he feared communicating with the social worker could have been treated as impermissible criticism or undue meddling on his part. The fear wasn't entirely without a foundation. B.C. lost unsupervised visitation with the children because his mother had ice cream with them after he was warned she no longer should participate in the visits. That was a lapse of judgment on B.C.'s part to be sure, and its repercussions reasonably could have imparted a message that he should not step across any lines without permission. B.C. also testified he had no contact information for the social worker as a reason he did not get in touch with her—a less persuasive rationale for his inaction.

The district court's reasoning in treating that inaction as compelling evidence that B.C. lacked a genuine desire or enthusiasm for parenting his children seems exceptionally thin. B.C. originally took custody of the children after their mother effectively withdrew from them. After this case was filed, he switched jobs to accommodate the girls' school schedule and worked at finding a suitable residence, albeit with less than stellar results. The evidence indicates B.C. completed the other tasks outlined in the reintegration plan, including a series of parenting classes. The district court dismissively discounted those efforts as merely "checking off boxes," apparently imposing some additional—and hidden—standard for true success. Moreover, B.C. could have voluntarily relinquished his parental rights at any step in this process. But he hasn't. The district court essentially fixated on an isolated instance of inaction on B.C.'s part, at best only loosely tied to anything directly pertinent to his parenting, to support a conclusion at odds with the bulk of the relevant evidence.

The district court also justified its unfitness determination based on what it considered B.C.'s failure to appreciate E.M.'s particular needs as a sexual assault victim and his inability to articulate and apply appropriate parenting skills, as reflected in the girls' unruly behavior. Under questioning from the assistant district attorney during the

9

termination hearing, B.C. testified that he understood E.M. required her own bedroom because of her age and her need for privacy. Likewise, during that questioning, B.C. was unable to parrot any specific parenting techniques from the classes he had taken. The district court found those to be unacceptable answers displaying a lack of "insight" and an inability "to understand the seriousness and significance of what happened to and between his children." The hearing testimony does suggest B.C. initially had some skepticism that D.P. had sexually abused E.M. But the record evidence shows that B.C. concluded the abuse happened. The record, however, is less than clear that B.C. had ever been informed that E.M. touched A.M. inappropriately during their foster placement. Even if B.C. had been told, the district court's reaction to his testimony seems unduly scathing and could be interpreted as evincing a degree of intellectual and social elitism.

Testifying in court can be a stressful, intimidating experience, especially for a person unaccustomed to that environment or when the stakes are particularly high. Here, B.C. was in precisely that kind of high-stakes situation, and he quite apparently lacked honed oratorical skills. So B.C. understandably would have been less than expansive in explaining himself or discussing the sexual abuse of his children. And it may be that B.C. isn't a particularly incisive or reflective thinker or possessed of a well-developed sense of empathy, just as the district court would have it. Those shortcomings would be less than desirable in any parent, but a below average capacity to be contemplative or empathetic does not render a parent legally unfit. The district court, however, appears to have punished B.C. for falling short of its measure either for those traits or for fluency on the witness stand.

The district court also considered the girls' behavior during the supervised visits in terminating B.C.'s parental rights, essentially finding him unfit because he couldn't better control them in that particular setting. Although the girl's was a legitimate matter of concern, the evidence isn't nearly as decisive as the district court would portray it. By all accounts, A.M. and E.M. did well during their visits with B.C. away from the case

10

manager's office. There appear to have been no notable instances of unruly behavior during the visits or negative spillover from those visits in school or elsewhere. The problems arose only when the visits were confined to the room at the office. Although not directly raised in the testimony, it appears the case manager was either unwilling to intervene and model appropriate "redirection" techniques during those visits or attempted to do so without success. Either way, that suggests B.C. shouldn't be held wholly and singularly responsible for the problems. And the case manager didn't try moving the visits elsewhere to see if a change in location might improve the girls' conduct.

During the termination hearing, nobody offered any explanation for the deterioration of the girls' behavior in that environment. The social worker apparently couldn't get at the cause and couldn't bring about an improvement in their behavior—precisely the sort of issues that presumably ought to be addressed in therapy. By recommending an end to all visitation, the social worker fell back on eliminating the circumstance sparking the problem rather than resolving its underlying cause.

At the termination hearing, the social worker and B.C.'s two most recent case managers testified in general terms about "safety" concerns associated with the girls' behavior during the visits and the lack of successful redirection of their unruliness. The opinion testimony was conclusory and lacked any real anchor in the factual circumstances. Nor was it apparent that A.M. and E.M. would continue to act out in a similar fashion if B.C. had extended physical custody of them in a different setting. In short, the testimony was so generic as to be unpersuasive in demonstrating B.C. to be an unfit parent to a clear and convincing standard.[2]

[2]The assistant district attorney representing the State at the termination hearing never attempted to qualify the social worker or either case manager as an expert witness. We suppose the social worker could have been so qualified based on what the record reveals about her training and experience. It is less clear the case managers had the requisite expertise. Each had only recently received an undergraduate degree in social work, and neither recounted training from the social service agency employing them or

11

previous work experience that would satisfy the standards for a testifying expert. K.S.A. 2016 Supp. 60-456(b) (expert must possess "specialized knowledge"); *Ohlmeier v. Jones*, 51 Kan. App. 2d 1014, 1019, 360 P.3d 447 (2015) (expert witness "must be skilled or experienced in the profession" to which his or her testimony relates), *rev. denied* 305 Kan. ___ (December 15, 2016). But even an expert opinion must take account of and be tied to the factual circumstances of the case in which it is offered. K.S.A. 2016 Supp. 60-456(b)(3).

*Conclusion*

The evidence in this case fails to rise to the level that would persuade a reasonable factfinder that, at the time of the termination hearing, B.C. clearly and convincingly was unfit to parent A.M. and E.M. or that any arguable unfitness was unlikely to change in the immediate future. B.C. may not have been the ideal parent for A.M. and E.M., particularly as a single head of the household. He might very well fall below average. But as we have said, that is not the standard. B.C. was neither negligent nor malicious in his parenting of A.M. and E.M. He had no pernicious conditions or characteristics that rendered him statutorily unfit. He endeavored to comply with the reintegration plan and largely did so, except for securing suitable housing in a timely fashion. But B.C. apparently leased an appropriate residence just before the termination hearing, although the district court broached no delay to verify his compliance. Examined as a whole, the evidence cannot be said to have proved B.C. unfit within the meaning of K.S.A. 2016 Supp. 38-2269(a), taking account of both the required inability to parent and the duration of that inability. We, therefore, reverse and remand for further proceedings.

We have set aside the finding of unfitness and, in turn, the termination order. A.M. and E.M., however, remain children in need of care. Accordingly, the district court should approve a new reintegration plan for B.C. The plan must fairly account for the lapse of time associated with this appeal and the extended absence of any contact between B.C. and his daughters—circumstances that almost certainly have made reintegration more complex. Any such untoward consequences ought to be attributed to

12

the judicial process. Accordingly, B.C. should not be disadvantaged in his renewed reintegration efforts because of the time taken up in this error-correcting function the appellate courts perform. We trust the district court will tailor a fair reintegration plan and take a constructive approach to family reunification in this case on remand, including some appropriate communication with E.M. and A.M. (whether through their guardian ad litem, the assigned case manager, or a social worker involved in their care) explaining B.C.'s continuing desire to regain custody of them and that his efforts had been temporarily halted because of a mistake by the courts.

The district court's order terminating B.C.'s parental rights with respect to A.M. and E.M. is reversed, and the case is remanded for further proceedings consistent with this opinion.