NOT DESIGNATED FOR PUBLICATION

Nos. 117,524
117,550
117,560

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.A., Jr., M.A., and Mh.A.,
Minor Children.

MEMORANDUM OPINION

Appeal from Douglas District Court; PEGGY C. KITTEL, judge. Opinion filed February 2, 2018. Affirmed.

*Juanita M. Carlson*, of Carlson Law Office, of Lawrence, for appellant natural mother.

*Kate Duncan Butler*, assistant district attorney, and *Charles E. Branson*, district attorney, for appellee.

Before POWELL, P.J., STANDRIDGE, J., and STUTZMAN, S.J.

PER CURIAM: S.J. (Mother) appeals the district court's termination of her parental rights to three of her children. In her appeal, Mother makes three arguments: (1) K.S.A. 2016 Supp. 38-2269(b)(5) is unconstitutionally vague; (2) the district court failed to find her unfit by clear and convincing evidence; and (3) the district court abused its discretion by finding that it was in the children's best interests to terminate her parental rights. For reasons more fully set out below, we disagree with Mother's arguments and affirm the district court's decision.

FACTUAL AND PROCEDURAL HISTORY

Mother and M.A., Sr. (Father) have three children who are the subjects of this termination of parental rights proceeding: twins M.A., Jr. and M.A., a male and a female (born 2011); and Mh.A., a female (born 2012). Mother has two older daughters who are not Father's children and not subject to these proceedings. The termination of Father's parental rights are not subject to this appeal.

In July 2013, the Kansas Department for Children and Families (DCF) investigated an allegation that Mother was asked to leave the Lawrence Community Shelter after she gave a fellow resident methamphetamine in exchange for the resident babysitting Mother's children. Through its investigation, DCF learned that the Shelter had made several reports against Mother for failing to supervise the children and that Father had at times stayed with Mother and the children at the Shelter under a false name. Later that month, Mother was arrested and telephoned an employee at The Ballard Center in Lawrence that she could not pick up the children from daycare. Mother stated that both parents were incarcerated and that no other relative could take the children. The employee contacted the Lawrence Police Department, which took the children into police protective custody.

Shortly thereafter, the district court issued an emergency ex parte order placing the children into DCF's protective custody. A few days later, the district court granted DCF temporary custody of the children, and they were placed with a foster family in Eudora, Kansas. At that time, the twins—M.A., Jr. and M.A.—were two-and-a-half years old and Mh.A. was one-and-a-half years old. In September 2013, the district court adjudicated M.A., Jr., M.A., and Mh.A. children in need of care. The children remained in the foster family's care in Eudora until May 2015.

Mother improved her circumstances over that time period, and the district court placed the children in Mother's Lawrence home in May 2015. Although Mother had recently disclosed she was pregnant (by a man other than Father, and that child was not subject to this proceeding), the district court stated that placing the children with Mother was appropriate because she had successfully maintained sobriety for nine months, was steadily employed, and had acquired stable housing.

As part of the February 2015 reintegration case plan, the district court required Mother and Father to avoid any further legal interactions, participate in random urinary analysis (UA) tests, and participate in outpatient drug treatment programs. The district court noted that the children had some difficult behavior, needed childcare that would accommodate their special needs, and that M.A., Jr. needed individual therapy. After the children's return to Mother's home, the Kaw Valley Center (KVC) transitioned the family into an aftercare program which worked to ensure that the children's needs were being met so they could stay in the home.

In July 2015, the district court ordered the reintegration plan to continue with the children placed in Mother's care. The district court further ordered that Mother could not allow Father into her home and that Father could not have unsupervised contact with the children without KVC or DCF approval. In August 2015, Mother suffered some setbacks. In early August, Mother went into the hospital to give birth. While in the hospital, Mother refused to submit to a UA when requested by the nurse, although the nurse eventually obtained a sample from Mother and the baby. Both samples tested positive for amphetamines. In mid-August, Mother was arrested for a domestic violence disturbance with Father. The children were not present during this incident.

In the fall of 2015, Mother learned that she would serve jail time in Johnson County due to her probation being revoked as a result of a February 2015 charge for felony theft in Douglas County. In December 2015, the children were removed from

Mother's home and placed with a family in Winfield, Kansas. Following a hearing in December 2015, the district court found that the case plan goal to reintegrate the children with Mother was no longer adequate and changed the case plan goal to adoption. Due to the distance between the children's placement in Winfield and Lawrence, in January 2016, KVC limited Mother's visits with the children to one supervised visit for two hours every other week.

Also at the end of December 2015, the State moved to terminate the parental rights of Mother and Father. The State asked the district court to find a presumption of unfitness for Father for his continued failure to meet his case plan tasks, and the State sought an unfitness finding for Mother because of a failure of reasonable efforts by public or private agencies to rehabilitate the family; a lack of effort by Mother to adjust her circumstances, conduct, or condition; Mother's conviction of a felony and imprisonment; and Mother's failure to carry out a reasonable plan directed at reintegration of the family.

The district court conducted four hearings on the termination of Mother's parental rights in the spring and summer of 2016. Father did not appear. Mother did appear and presented evidence showing her parenting skills and progress towards reintegration and also the setbacks she experienced which led to the second removal of the children from her care.

*Mother's Parenting Skills*

Numerous caseworkers and therapists testified at the hearing that Mother had a strong bond with the children. Additionally, the testimony established that Mother did not have trouble attending the sessions or interacting with her caseworkers. But the testimony generally acknowledged that due to the children's "high energy" and special needs, Mother had difficulty providing direction to the children at times. Mother completed parenting training through KVC in 2014 and continued to have one-on-one parenting

4

training with Anissa Pfannenstiel at KVC until August 2015. Pfannenstiel testified that she saw growth in Mother's parenting skills during the time that she worked with her.

In 2015, M.A., Jr.'s therapist—Alicia Johnson-Turner—diagnosed him with an unspecified disruptive impulse control and conduct disorder. M.A., Jr. reportedly had aggressive and angry behaviors towards others at times and was asked to leave a few childcare centers during his time with the foster family in Eudora and while placed in Mother's custody. Johnson-Turner testified that she worked with M.A., Jr. to develop a secure attachment to Mother and to help him learn to process emotional traumas. Mh.A. was diagnosed by her therapist with "reactive attachment disorder" because she showed signs that she would immediately attach to any person, even a stranger, who showed an interest in her. M.A. was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct. In general, the testimony established that the children—due to their young ages and their behaviors—could be difficult for anyone to handle.

The children's therapists testified, however, that Mother showed a sincere desire to learn how to work with the children. The therapists each stated that they needed more time with the children and that Mother would continue to have difficulty balancing a full-time job and the children's therapy appointments. The therapists and other caseworkers also testified that Mother needed individual therapy herself to address her mental health, i.e., her stress levels and her past and current substance abuse issues. Through a psychological and parenting evaluation in 2013, Mother had been diagnosed with dysthymic disorder—a low-level depression. Additionally, Mother had to rely on C.W.— the children's maternal grandmother—to provide her and the children with transportation to and from therapy because Mother's driver's license was suspended. Mother testified that she could not obtain her driver's license until 2018 and after paying a $4,000 fine. Mother and the therapists stated that C.W. was a support to Mother and the children during the time the children were placed in her custody.

5

At the parental rights termination hearing, Tara Peterson—the permanency caseworker—testified that Mother's visits with the children following her release from jail in January 2016 were supervised every other week for two hours in Lawrence. Peterson testified that KVC did not increase Mother's visits with the children due to the distance between the placement home in Winfield and the difficulty in transporting three young children in a car for six hours. Peterson stated that Mother had some difficulty supervising the children during the visits and that the placement family reported that the children were acting out with authority figures in the placement home and at school. Additionally, Peterson stated that the placement parents said that the visits with Mother tended to increase the children's acting out. The placement parents told Peterson that they were open to adoption but hoped to see improvement in the children's behaviors before committing to such a process.

*Mother's Housing*

At the start of the case, Mother had difficulty with housing. Following the children's removal due to Mother's and Father's incarceration in 2013, Mother lived with friends or stayed in hotels. During 2014, Mother spent some time in jail and lived in two Oxford Houses—houses that help individuals with past substance abuse problems maintain sobriety—for a short period of time. Mother ultimately rented a four-bedroom home in Lawrence in August 2014 and maintained her residence there throughout the proceedings.

*Mother's Finances*

Mother had several different jobs and had financial troubles. In relevant part, Mother incurred child support arrears from the children's and her older daughter's time in foster care. KVC helped Mother pay a few utility bills, but Mother testified that her money troubles at that time were due to the child support agency taking out the wrong

6

and higher amount of money from her paycheck for the child support arrears. Mother also had to rely on KVC to pay the children's childcare costs, but a KVC caseworker testified that the agency identified childcare as a need that was necessary in order to help the children succeed in aftercare. The agencies also provided C.W. with gas cards to help with costs to transport the children to therapy appointments.

*Mother's Employment*

The testimony established that Mother had obtained employment—but with different employers during the pendency of case. After Mother's psychological and parenting evaluation, Mother's need for employment was placed as a priority. When the children were first removed in 2013, Mother testified that she had been unemployed for six months. Mother stated she worked a few short-term, part-time jobs after the children were brought into State custody and until she was incarcerated in 2014. After her release, Mother served time at the Residential Center in Johnson County and worked as a waitress at a restaurant in Overland Park. Mother then moved back to Lawrence and worked as a waitress from August 2014 to January 2015. Mother left that job to work for the school district in January 2015. Mother also worked for a couple of restaurants part-time during the summer until she had to stop working in July 2015 due to her pregnancy.

Mother stated that after she had her baby, she began working full-time at a call center in Lawrence from August 2015 until November 2015. She had to stop working at the call center due to her probation revocation and subsequent incarceration in November 2015. Mother resumed work at the call center after her release from jail in January 2016 and worked there until April 2016. She initially left the call center temporarily due to scheduling conflicts with her treatment sessions, but when she returned to the call center Mother was denied continued employment due to a background check and her criminal history. Mother then started working full-time at a restaurant in Lawrence as a waitress but had trouble balancing her visitation and substance abuse treatment appointments. At

7

the time of the termination proceedings, Mother stated she had started to work part-time for an assisted living company. She testified that she needed a full-time job if the children were placed back in her custody.

*Mother's Criminal History*

Mother testified that she had previous criminal cases in Douglas County and Johnson County during the timeframe of this case. The district court noted that Mother had several driving while suspended charges. Additionally, Mother incurred two drug possession convictions in Douglas County—one in 2010 and one in November 2013. During the time the children were in State custody, Mother was also arrested and convicted of felony theft in Douglas County in 2015.

Mother testified that between July and November 2013, she was in the Douglas County jail about four different times for periods ranging from one day to two weeks. In July 2013, she spent 11 days in jail for a drug-related charge. In November 2013, she spent about two weeks in jail for a municipal court charge. Mother stated that generally the jail terms in Douglas County were the result of a single charge and that the November jail term occurred because she missed a court date while she was in inpatient treatment.

In January 2014, Mother served three days in the Johnson County jail. She spent over a month in jail in May 2014 and then served a 90-day term at the Residential Center. Mother's last jail sentence in December 2015 in Johnson County was also, in part, the cause of the children's second removal. Mother was released from jail at the end of January 2016.

During the children's placement in her home, Mother spent one night in Douglas County jail as a result of her domestic violence arrest in August 2015. Mother stated that she was currently on probation in Douglas County for the 2015 felony theft charge and

8

would remain on probation until November 2016. Mother stated that the 2015 felony theft charge was her last pending charge.

*Mother's Relationship with Father*

Mother stated her romantic relationship with Father began in January 2010 and ended in May 2014. She admitted she was intimate with Father five times in 2014, with the last occurrence in January 2015. Mother stated that while the children were placed in her home, she allowed Father to interact with the children about 5 to 10 times. She testified she knew that he was permitted only supervised contact but believed she could supervise the contact. Initially, Mother allowed Father to come over during dinner time to help her with the children because he appeared sober. Mother admitted that problems started to arise in June and July 2015 when he became more erratic, and she believed he was using drugs. Mother stated that she allowed Father to stay overnight two times to avoid an argument while the children were placed in her custody but that the children were already in bed.

Mother typically did not call the police or inform KVC when Father came to her home during the time the children lived with her. The first domestic violence incident reported to the police occurred in August 2015, and Mother was arrested and spent one night in jail. She testified that she did not believe she was charged in that case. She stated the children were not present and that she generally felt Father was at fault for this incident.

Mother's KVC aftercare caseworker, Holly Stidham, testified that Father was at Mother's house when she went for her last visit with the family in early October 2015. Stidham stated that she had completed a safety plan with Mother a few months earlier: If Father came to the house, Mother was supposed to call the police. Stidham stated that she had concerns that Father was using drugs in the house after he contacted her at the office

and reported that he had been living in the home and was using drugs at that time. Stidham stated that after speaking with Father, she conducted a walk-through of Mother's home and asked Mother to submit to a UA test. Stidham testified that the UA test result was negative and that she did not see any of Father's belongings in the home. Johnson-Turner—M.A., Jr.'s therapist—testified that Father made an unscheduled visit to her office in August 2015, telling her that he and Mother were high during one of the therapy meetings with Johnson-Turner.

In October 2015, Mother and Father had a second domestic violence incident that was reported to the police and that the children witnessed. Mother testified that she had cut off contact with Father but he would show up at her house while her mother was watching the children and while she was working at the call center. Mother testified that once on her birthday, after she came home, Father gave her a birthday card but then became physical with her when she asked him to leave. Mother testified that he pushed her, pulled her hair, and she ended up with a scrape on the side of her head. Mother admitted that the children had witnessed other incidents of domestic violence in 2012, prior to the start of the case.

According to Amber Seater, the final aftercare worker assigned to the family's case in October 2015, Mother had been informed by October 2015 that Father was not supposed to be in the home. Seater encouraged Mother to file a petition for a protection from abuse (PFA) order against Father following the second incident and told Mother to call the police if Father came to the house.

Amanda Brunk, a Child Protective Specialist with DCF, testified that she did not conduct an investigation of the incident in August 2015 due to the high level of involvement by other members of KVC with the family. She did investigate the domestic violence incident in October 2015 to determine if Mother and Father had emotionally abused the children. M.A. and M.A., Jr. both told Brunk that Father had hurt Mother's

10

forehead. Brunk testified that she could not locate Father despite attempts to contact him by mail. Brunk did not find that the incident met the statutory requirements for causing emotional abuse to the children. Following her October 2015 investigation, Brunk instructed Mother to obtain a PFA order against Father.

Mother stated that she filed several PFA orders, without outside help, against Father following the October 2015 incident. She testified that she filed one in November 2015 but admitted it was dismissed because she chose not to appear for the hearing. She sought a second PFA order against Father in December 2015, but that petition was dismissed because she could not attend the hearing due to her incarceration in the Johnson County jail. After her release, Mother sought a third PFA order against Father in March 2016; that order was finalized and expired in April 2017. Mother stated that she filed the third PFA petition after Father broke into her home through the basement wall and she called the police. At the hearing, Mother stated that she did not have a relationship with Father and does not plan to reunite with him.

Dr. Jean Dirks, who conducted Mother's psychological and parenting evaluation in 2013, stated that Mother did not appear to fully understand the problem of her continued relationship with Father. The two aftercare caseworkers who worked on Mother's case in 2015 stated that Mother and Father's interactions were a cause for concern. Stidham stated it concerned her because Mother was not reporting that Father came over and that the interactions had become violent. Seater, who took the case after Stidham's departure, stated that Father's continued interactions with Mother were a cause of concern because of his drug use and the domestic violence.

*Mother's Substance Abuse and Treatment History*

Mother disclosed that she had an alcohol problem in her early 20s and after the twins' birth but has not had any issues with drinking since that time. Mother admitted that

she has more difficulty maintaining her sobriety with prescription pain killers. She testified that initially she was prescribed pain killers to treat chronic back pain and that she began to abuse pain killers after the children were born. She stated that the drugs cause her to become impulsive, impair her judgment, and make her an unsafe parent. Mother stated that her stress tends to cause her to want to use pain killers.

Mother completed a RADAC assessment in September 2013 and participated in inpatient treatment in Shawnee, Kansas, a month later. Mother was unable to complete the treatment because she was arrested for failure to appear in a municipal court case. Mother also had substance abuse treatment as a part of her term in the Residential Center in Johnson County. Mother completed an outpatient treatment program called the "Road to Recovery" in 2014; she also started an outpatient program through DCCCA in early 2014 but did not complete the program because she went to jail.

Mother admitted that she relapsed and used drugs after the children were placed in State custody two separate times. She stated she used drugs with Father in November 2013 before she went to jail, and she admitted to using drugs in July 2015 when she was pregnant and while the children were placed in her care. Mother stated she obtained the prescription amphetamines from a friend when she was pregnant. Mother stated she has not abused any prescription drug since her pregnancy.

Mother continued to receive substance abuse treatment after her release from jail in January 2016 and throughout the termination proceedings. Mother testified that she started a 12-week outpatient substance abuse treatment program in February 2016. The DCCCA program provided Mother with follow-up support after her completion. Mother also stated that she attended one Narcotics Anonymous meeting in January 2016 and began to attend a similar program more regularly in the summer of 2016. Further, Mother stated that she receives weekly support from her sponsor. Mother stated that she has a relapse plan. As part of the DCCCA treatment program, Mother has submitted a UA

12

sample weekly and has not had a positive UA result for drugs since her baby was born in 2015.

At the end of the hearings, the district court did not make any oral factual findings or legal conclusions. Rather, the district judge permitted the parties to submit proposed findings of facts and conclusions of law before she issued her final order. In February 2017, the district court issued an order terminating Mother's and Father's parental rights to the children.

Mother timely appeals.

I.      IS K.S.A. 2016 SUPP. 38-2269(b)(5) UNCONSTITUTIONALLY VOID FOR VAGUENESS?

On appeal, Mother asserts that K.S.A. 2016 Supp. 38-2269(b)(5) is unconstitutionally vague but acknowledges failing to raise the issue below. Generally, a constitutional challenge not raised before a district court cannot be raised for the first time on appeal unless the party asserts an exception to the general rule. See *State v. Williams*, 298 Kan. 1075, 1083-85, 319 P.3d 528 (2014); *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 (1967). Among the exceptions to the general rule includes permitting a party to assert claims that are necessary to serve the ends of justice or to prevent the denial of a fundamental right. *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010).

Mother argues we should consider her constitutional challenge because it will prevent the denial of a fundamental right. The United States Supreme Court recognizes that a natural parent has a fundamental liberty interest and fundamental right to make decisions regarding the care, custody, and management of his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)

(fundamental liberty interest); *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (fundamental right). Moreover, another panel of this court recently considered a void-for-vagueness challenge to K.S.A. 2016 Supp. 38-2269(b)(5) for the first time on appeal, reasoning that if the provision were unconstitutionally vague, then a district court's use of the provision in a parental termination proceeding would result in fundamental unfairness to that parent. *In re S.D.*, No. 116,185, 2017 WL 2001662, at *2 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. __ (November 9, 2017). Accordingly, we will consider Mother's void-for-vagueness challenge for the first time on appeal.

A statute's constitutionality is a question of law subject to unlimited review. When reviewing a challenge to the constitutionality of a statute, we presume that the statute is constitutional and must resolve all doubts in favor of the statute's validity. *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 544, 316 P.3d 707 (2013). "'If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. [Citations omitted.]'" *In re A.E.S.*, 48 Kan. App. 2d 761, 768, 298 P.3d 386 (2013) (quoting *Kansas Judicial Review v. Stout*, 287 Kan. 450, 460, 196 P.3d 1162 [2008]). The challenging party has the burden to prove the statute unconstitutional. *Farmway*, 298 Kan. at 544.

A two-prong test is employed to determine if a statute is unconstitutionally vague, and we will find the law void if it violates either prong. 298 Kan. at 545. First, we must determine if the statute gives adequate warning of what conduct is prohibited. Second, we must determine if the statute's terms are precise enough to protect against arbitrary and discriminatory enforcement. *Farmway*, 298 Kan. at 545; see *Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000).

The level of specificity required to avoid rendering a statute unconstitutionally vague depends on the type of conduct the statute regulates. More specificity is required

14

for criminal statutes, and less specificity is required for business regulations. As applied to the termination of parental rights, the level of specificity required falls somewhere between the criminal statute and the business regulation. *In re Brooks*, 228 Kan. 541, 544, 618 P.2d 814 (1980) (quoting *Davis v. Smith*, 266 Ark. 112, 120-21, 583 S.W.2d 37 [1979]).

A.       *K.S.A. 2016 Supp. 38-2269(b)(5) provides adequate notice of prohibited conduct.*

A statute is unconstitutionally vague if the statute does not

"'convey sufficient definite warning and fair notice as to the prohibited conduct in light of common understanding and practice.' [A statute] 'so vague that persons of common intelligence must necessarily guess as its meaning and differ as to its application is violative of due process.' . . . But [a statute] is not unconstitutionally vague if it employs words commonly used, previously judicially defined, or having a settled meaning in law. [Citations omitted.]" *Farmway*, 298 Kan. at 545.

K.S.A. 2016 Supp. 38-2269(b) requires that a district court rendering a determination of unfitness to consider certain statutory factors, although it is not limited to a consideration of the enumerated factors alone. K.S.A. 2016 Supp. 38-2269(b)(5) provides:

"(b) In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:

. . . .

(5) conviction of a felony and imprisonment."

Mother argues that the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., does not contain statutory definitions for "felony" and "imprisonment." See K.S.A. 2016 Supp. 38-2202. Mother concedes that "felony" has a clearly and commonly

understood meaning and challenges only the constitutionality of the term "imprisonment," arguing that "imprisonment" is vague because it could have several meanings under the sentencing guidelines and its application may differ based on the timing of the individual's imprisonment. We disagree.

Mother acknowledges that another panel of this court found similar arguments unpersuasive in *In re S.D.*, 2017 WL 2001662, at *3-4, but argues that panel merely glossed over the definition of imprisonment in a CINC case. Mother contends that "imprisonment" requires a bright-line definition in the CINC context due to the variety of imprisonments available in the criminal justice system. In our view, the panel in *In re S.D.* did not merely gloss over the meaning of "imprisonment" as Mother claims. Specifically, the panel found the vagueness argument of the term "imprisonment" unpersuasive and rejected the appellant's hypotheticals, stating that "a statute is not to be struck down as vague only because marginal cases could be put forward that might cause doubts to arise." 2017 WL 2001662, at *4.

One of the cardinal rules in statutory construction requires us to construe an act "in pari materia with a view to reconciling and bringing those provisions into workable harmony." *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1123, 307 P.3d 1255 (2013). One way to make this determination is to look at the meaning of the words within the statute and within the entire statutory code as "[s]tatutory wording must be considered in light of the entire code and not in isolation." *In re S.D.*, 2017 WL 2001662, at *3.

Within the criminal code, K.S.A. 2016 Supp. 21-6803(m) defines "imprisonment" as "imprisonment in a facility operated by the Kansas department of corrections." Moreover, the term imprisonment has generally been found to be interchangeable with the word confinement. See *State v. Huff*, 277 Kan. 195, 203-05, 83 P.3d 206 (2004); *In re S.D.*, 2017 WL 2001662, at *3. We conclude that a person of ordinary intelligence should

16

understand that a "conviction of a felony and imprisonment" under K.S.A. 2016 Supp. 38-2269(b)(5) means that a person convicted of an offense that constitutes a felony is confined to prison for that offense.

Mother attempts to argue that there is a discrepancy in the timing of "imprisonment" that renders the statute vague as provided by the differing factual circumstances in three reported cases from this court. But the cases cited by Mother as support for her argument—*In re M.H.*, 50 Kan. App. 2d 1162, 1171-73, 337 P.3d 711 (2014); *In re K.P.*, 44 Kan. App. 2d 316, 317-20, 235 P.3d 1255 (2010); *In re S.D.*, 41 Kan. App. 2d 780, 789-91, 204 P.3d 1182 (2009)—review the district court's application of K.S.A. 2016 Supp. 38-2269(b)(5) for insufficient evidence. The cases do not provide that the statutory meaning of the phrase "conviction of a felony and imprisonment" would cause a person of ordinary intelligence to guess at its meaning. Accordingly, we find that K.S.A. 2016 Supp. 38-2269(b)(5) is not unconstitutionally void for vagueness under the first prong.

B.    *The statutory framework protects against arbitrary and discriminatory enforcement.*

Mother also asserts that we must review whether K.S.A. 2016 Supp. 38-2269(b)(5) encourages arbitrary and discriminatory enforcement based on the application of the procedural safeguards applied in *In re A.F.*, 13 Kan. App. 2d 232, 767 P.3d 846 (1989). However, it appears Mother is relying on the wrong case—as did the mother in *In re S.D.*—because *In re A.F.* does not contain a vagueness challenge and makes no mention of procedural safeguards. Rather, we suspect Mother wishes to rely upon *In re A.F.*, 38 Kan. App. 2d 773, 172 P.3d 66 (2007), *disapproved of on other grounds by In re B.D.-Y.*, 286 Kan. 686, 187 P.3d 594 (2008), as her authority because it analyzes K.S.A. 2005 Supp. 38-1502(b)—a prior CINC statute—on a void-for-vagueness challenge.

Mother argues that procedural safeguards in the CINC statute do not sufficiently protect individuals subject to termination proceedings from arbitrary and discriminatory enforcement of K.S.A. 2016 Supp. 38-2269(b)(5). The panel in *In re S.D.*, 2017 WL 2001662, at *4, already addressed this issue and disagreed.

> "[T]he language of K.S.A. 2016 Supp. 38-2269(b) prevents arbitrary or discriminatory enforcement. When considering the possibility of arbitrary enforcement, we look to the entire Act, not an isolated subsection. . . . Subsection (b) provides a nonexclusive list of factors the district court must consider in the fitness determination. . . . By using the word 'shall' in subsection (b), the legislature made the consideration of those factors mandatory if they are present. But whether that factor is grounds for terminating parental rights is ultimately controlled by the test in K.S.A. 2016 Supp. 38-2269(a). Namely, whether the 'conduct or condition renders the parent unable to properly care for a child and the conduct or condition is unlikely to change in the foreseeable future.'

> "Because considerations of these factors are made mandatory by the legislature, there are no grounds for arbitrary or discriminatory enforcement. . . . This mandatory requirement of the district court to consider the factors is the opposite of arbitrary enforcement. Additionally, under the analysis found in *In re A.F.*, the fact that unfitness must be proved by clear and convincing evidence protects against arbitrary enforcement. See 38 Kan. App. 2d at 778-79. . . .

> "Clearly, K.S.A. 2016 Supp. 38-2269(b)(5) passes constitutional muster."

We adopt the reasoning in *In re S.D.* and find that K.S.A. 2016 Supp. 38-2269(b)(5) is not unconstitutionally void for vagueness.

II.    DOES CLEAR AND CONVINCING EVIDENCE SUPPORT THE DISTRICT COURT'S UNFITNESS FINDING?

Mother also argues the State failed to prove by clear and convincing evidence that Mother was unfit because the evidence provides that Mother substantially complied with her case plan tasks.

In order for the district court to terminate parental rights, the State must prove by clear and convincing evidence that (1) the parent is unfit and (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. K.S.A. 2016 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). The State also must prove, albeit only by a preponderance of the evidence, that termination is in the best interests of the child. K.S.A. 2016 Supp. 38-2269(g)(1).

Our standard of review on appeal necessarily depends on the State's burden of proof at the termination proceedings. If the issue on appeal relates to the district court's decision regarding current and future unfitness, we review all the evidence, in the light most favorable to the State, to determine whether we are convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that a parent is unfit and the conduct or condition rendering the parent unfit is unlikely to change in the foreseeable future. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In making this determination, we do not reweigh the evidence, judge the credibility of the witnesses, or redetermine questions of fact. *In re B.D.-Y*, 286 Kan. at 705.

A.    *Did the district court err in finding Mother presently unfit?*

The Revised Kansas Code for Care of Children, K.S.A. 2016 Supp. 38-2201 et seq., lists a number of nonexclusive factors the district court shall consider in determining

a parent's unfitness. See K.S.A. 2016 Supp. 38-2269(b) and (c). Any one of the factors may, but does not necessarily, establish grounds for terminating a parent's rights. K.S.A. 2016 Supp. 38-2269(f). The district court is not limited only to the statutory factors in making a determination of unfitness. K.S.A. 2016 Supp. 38-2269(b).

Here, the district court found Mother unfit under several of the statutory factors:

- K.S.A. 2016 Supp. 38-2269(b)(7)—failure to rehabilitate Mother with her children despite reasonable efforts made by appropriate public or private agencies.
- K.S.A. 2016 Supp. 38-2269(b)(8)—Mother's failure to adjust her circumstances, conduct, or conditions to meet the needs of the children.
- K.S.A. 2016 Supp. 38-2269(c)(3)—Mother's failure to carry out a reasonable plan approved by the court directed toward the integration of the children into her home.
- K.S.A. 2016 Supp. 38-2269(b)(5) and K.S.A. 2016 Supp. 38-2269(b)(3)—The nature and duration of Mother's drug use and her felony convictions and imprisonment rendered Mother unfit and unable to care for the ongoing physical, mental, or emotional needs of the children.

Mother does not challenge whether the evidence supporting each individual factor is clear and convincing. Rather, Mother argues that the district court erred because it focused on past conduct and not on her current and continued substantial compliance with her case plan tasks in ruling her an unfit parent. But our task on review is to determine whether the district court's findings under each separate statutory factor is supported by clear and convincing evidence. Admittedly, some of the statutory subsections are similar in nature and overlap, but the district court's factual findings to support unfitness under one statutory subsection alone may, but not necessarily, support termination of Mother's parental rights. See *In re A.M.*, No. 116,986, 2017 WL 3001353,

*3 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. ___ (November 9, 2017).

1.     *K.S.A. 2016 Supp. 38-2269(b)(7)*

K.S.A. 2016 Supp. 38-2269(b)(7) states that in considering a parent's fitness, the district court shall consider the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family."

As noted above, Mother does not argue that the district court's finding under subsection (b)(7) is not supported by clear and convincing evidence. K.S.A. 2016 Supp. 38-2269(f) provides that only one statutory factor supported by clear and convincing evidence is needed to support a finding of unfitness. Arguably, Mother's failure to adequately brief the issue may provide that Mother has waived it, but given the gravity of the issue of parental rights—and as other panels of our court have done—we shall consider the issue on appeal. See, e.g., *In re M.A.*, No. 110,069, 2013 WL 6799335, at *7 (Kan. App. 2013) (unpublished opinion).

The district court found that the family had received many services from public and private agencies, including, but not limited to, family and individual therapy; financial assistance; assistance in obtaining housing; psychological and parenting evaluations; substance abuse assessments, testing, and treatment; and medications for Mother and M.A., Jr.

In viewing the evidence in the light most favorable to the State, the agencies made reasonable efforts to rehabilitate the family. The KVC caseworkers testified that the family had weekly drop-in visits while the children were in Mother's custody from May 2015 to late November 2015. Pfannenstiel, the KVC parenting skills trainer, testified that she extended training with Mother until August 2015. Additionally, the agencies

21

provided C.W. with gas cards to help alleviate some of the expenses of transporting the children to therapy. KVC also covered the expenses of the children's childcare.

Mother's two aftercare caseworkers—who worked with her during the children's placement in her home—stated that the same struggles from the beginning remained at the end, and neither caseworker believed that any other services could have been provided to benefit the family. Therefore, we conclude that the district court's finding— that the failure of reasonable efforts by public or private agencies to rehabilitate the family—is highly probable and supported by clear and convincing evidence.

2.      *K.S.A. 2016 Supp. 38-2269(b)(8)*

K.S.A. 2016 Supp. 38-2269(b)(8) states that in considering a parent's fitness, the district court shall consider the "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the [children]." Again, Mother does not specifically argue that the district court failed to support its finding by clear and convincing evidence but argues that she was in substantial compliance with meeting her case plan tasks.

In several aspects, Mother made efforts to adjust her circumstances, conduct, or conditions to meet the needs of the children during the course of the case. Mother completed parenting training with KVC and continued training until Pfannenstiel left the agency in August 2015. Mother also has maintained stable housing since August 2014 and through the termination hearings. Additionally, Mother regularly participated in the children's therapy and attended the visitations with the children.

But Mother also had trouble during the case—as indicated by the district court in its order finding that K.S.A. 2016 Supp. 38-2269(b)(8) applied due to Mother's financial instability, incarceration, and domestic violence. We hold the district court's findings on

this point are not supported by clear and convincing evidence. Mother made an effort to become more financially stable during the course of this case. Throughout the case, Mother continued either to seek employment or remain employed. Mother paid her utility bills for the most part, although she asked for assistance from KVC two times, with at least one request due to the child support agency deducting too large of an amount from her paycheck to pay her child support arrears. Additionally, Mother changed jobs at least once to continue to make it possible for her to meet her case plan task for attending substance abuse treatment. While Mother did not pay for childcare, a KVC caseworker testified that the agencies decided when the family started aftercare it was an identified need that the agencies were willing to pay. Moreover, Mother continuously made efforts to seek employment—based on her changes in employment during the course of the case. Accordingly, we must conclude the evidence is not highly probable that Mother showed a lack of an effort to become more financially stable.

Another issue that developed and was present throughout the proceedings was whether Mother failed to change her circumstances and conduct regarding her relationship with Father. The district court cited Mother's and Father's domestic violence at the home as one of the reasons that supported the application of K.S.A. 2016 Supp. 38-2269(b)(8).

The children were placed in Mother's care in May 2015, but Mother was arrested for domestic violence against Father in August 2015. In late October 2015, the children witnessed a domestic violence incident between Mother and Father. Also, prior court orders stated that Father should only receive supervised visits as approved by KVC or DCF, but Mother also allowed Father to interact with the children in early October 2015. Although Mother testified that she thought "supervised" meant she could supervise him and the children, Mother also admitted that the children had witnessed Mother and Father engage in prior domestic violence incidents in 2012. Moreover, Mother testified she chose not to prosecute her PFA order against Father immediately after the incident in

23

October 2015. We conclude the district court's finding that Mother failed to adjust her circumstances, conduct, or conditions to meet the needs of the children in regards to Mother's and Father's domestic violence is supported by clear and convincing evidence.

Finally, Mother's arrests and incarcerations impacted her ability to care for the children during this case. The children were adjudicated CINCs as a result of Mother's arrest in July 2013. Mother was charged in Douglas County with felony theft in February 2015 and was convicted in September 2015. This new conviction resulted in the revocation of her probation from a Johnson County criminal case, and the Johnson County District Court ordered her to jail. These events led to the children's removal from Mother's care in December 2015. Here, Mother's new criminal charge in February 2015 and her continued incarcerations impacted her ability to meet the children's needs. The district court's finding that Mother failed to adjust her conduct, condition, or circumstances to meet the children's needs is supported by clear and convincing evidence when based on the factual evidence of domestic violence and Mother's incarcerations.

3.      *K.S.A. 2016 Supp. 38-2269(c)(3)*

K.S.A. 2016 Supp. 38-2269(c)(3) provides that "when a child is not in the physical custody of a parent," the district court is to consider a parent's "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." At the time of the parental rights termination hearing, the children were placed with a foster family in Winfield.

Mother challenges the district court's finding that she failed to carry out her case plan tasks approved by the district court and directed toward reintegration by arguing that she substantially complied with each task assigned to her.

24

As stated above, Mother complied with many of her case plan tasks during the reintegration case plan before and during the children's placement in her home. But Mother's case plan required that she avoid further legal interactions too. Mother was convicted of felony theft in Douglas County in 2015, and that new conviction resulted in a probation revocation in a Johnson County case in late 2015. Also, Mother continued to allow Father to have unsupervised interactions with the children despite court orders forbidding his visits without prior KVC or DCF approval. Mother's and Father's involvement led to the children witnessing one domestic violence incident in October 2015. Moreover, the district court removed the children from Mother's care a second time and changed the case plan goal to adoption following the domestic violence incident and Mother's resulting jail sentence from a probation revocation. In viewing the evidence in the light most favorable to the State, clear and convincing evidence supports the district court's finding that Mother failed to carry out a reasonable plan approved by the district court and directed toward integration into Mother's home.

4.      *K.S.A. 2016 Supp. 38-2269(b)(3) and (b)(5)*

K.S.A. 2016 Supp. 38-2269(b)(3) states that in considering a parent's fitness, the district court shall consider "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." Again, Mother does not specifically challenge that the district court's finding is supported by clear and convincing evidence on appeal but argues that she was in substantial compliance with meeting her case plan tasks.

In reviewing the evidence in the light most favorable to the State, the district court's finding that Mother's drug use was of such nature and duration as to render her unable to care for the children's physical, mental, or emotional needs was supported by clear and convincing evidence. Mother admitted that her drug use impacted her ability to care for the children. While it is true that Mother had a large number of negative UA test

25

results during the course of this case, nevertheless, when Mother was at the hospital to give birth to her baby, the samples from Mother and the baby both tested positive for amphetamines. The positive UA occurred in August 2015, when the children were in Mother's physical custody.

The district court noted in the order terminating Mother's parental rights that Mother had at least two criminal cases based on drug possession and one felony conviction. While she received probation for her felony, her probation for another crime was revoked and she was incarcerated. Although Mother had taken steps to treat her substance abuse, Mother's relapse during her pregnancy and the children's placement in her home made it highly probable that the nature of Mother's drug use corresponds with a finding that her drug use makes her unable meet the children's needs. Also, Dr. Dirks testified that although relapses are common, Mother's relapse in July 2015 was problematic because she should not relapse after treatment. She stated that Mother would need to stay clean for around nine months but questioned Mother's motivations for her recent sobriety as stemming from the pending termination proceedings.

Several people involved in the case testified at the hearing that Father's presence in Mother's life also contributed to Mother's drug abuse and the children's exposure to drug abuse. Dr. Dirks found it problematic that Mother continued her relationship with Father for three years after Dr. Dirks told Mother he was a bad influence. Stidham testified she questioned Father's presence in Mother's house in early October 2015 due to his confessed drug use and increasingly violent behavior. Additionally, Johnson-Turner worried about the children's possible exposure to drug abuse by both parents. Based on the evidence presented at the hearing, the district court's finding that Mother's drug use was of such a nature and duration to render her unable to meet the ongoing physical, mental, or emotional needs of the children was supported by clear and convincing evidence.

26

B. *Did the district court err by finding Mother would remain unfit for the foreseeable future?*

Mother does not specifically argue that the district court's finding that she would remain unfit in the foreseeable future was not supported by clear and convincing evidence. Rather, Mother argues that her continued substantial compliance with case plan tasks up to the termination proceedings shows the district court erred in focusing only on her past conduct and not on her more recent positive changes in maintaining stable housing, employment, drug treatment, visitation with the children, individual therapy, and ending her relationship with Father.

As we have already stated, an unfitness finding is twofold: The district court must find by clear and convincing evidence that a parent is presently unfit and that the parent's unfitness is unlikely to change in the foreseeable future. K.S.A. 2016 Supp. 38-2269(a). The term "'foreseeable future'" is measured from the child's perspective and takes into account a child's perception of time; this court has considered periods of time as short as seven months to be within the foreseeable future from a child's perspective. *In re S.D.*, 41 Kan. App. 2d at 790.

Contrary to Mother's argument, the district court may consider past behavior in its analysis to predict a parent's future unfitness. See *In re Price*, 7 Kan. App. 2d, 477, 483, 644 P.2d 467 (1982). "A parent's actions, not intentions, are the measure to be used in determining the likelihood of change in the foreseeable future." *In re M.H.*, No. 117,127, 2017 WL 5951684, at *4 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* December 29, 2017 . As stated by the panel in *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237, *rev. denied* 286 Kan. 1177 (2008), the determination is often a difficult one:

"Cases like this are difficult ones. A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time."

Here, the district court stated:

"Although the mother achieved reintegration at one point, she was unable to sustain any meaningful change, and she remained financially unstable, unable to meet the children['s] mental needs, unable to prevent children from exposure to domestic violence, and unable to make suitable arrangements for care for the children when she was, yet again, incarcerated in December 2015. The issues that initially brought the children into foster care still remain."

The district court's finding that Mother would remain unfit in the foreseeable future is supported by clear and convincing evidence. When the children entered State custody and were placed with the Eudora foster family in July 2013, the twins were two-and-a-half years old, and Mh.A. was one-and-a-half years old. Twenty-two months later, in May 2015, the children were placed in Mother's physical custody. At the time the children were removed from Mother's home eight months later, M.A., Jr. and M.A. were nearly five years old and Mh.A. was nearly four years old.

Here, the district court considered Mother's past actions in comparison to her more recent actions which had led to the children's second removal from her care, Mother's incarceration, and her failure to find suitable caretakers for the children. The past behavior for which Mother complains the district court weighed too heavily, however, occurred within the scope of the case—i.e., it was the cause of the children's placement in State custody. Contrary to Mother's argument that the district court was wrong in emphasizing Mother's past behavior, the district court used Mother's past behavior—

28

which caused the children to enter State custody—as the benchmark for judging whether Mother had improved or could improve her circumstances within the foreseeable future so as to allow her to regain custody of the children. The district court did not err in considering Mother's past behavior in this manner. The district court noted a pattern in Mother's behavior over the past three years of the case and predicted Mother's failure to maintain her positive changes when the children were placed in her custody as negatively impacting her ability to adequately care for the children in the foreseeable future.

It should also be emphasized that these children needed more attention than most. At least one caseworker felt Mother could care for the children but with difficulty. Peterson, the family's permanency caseworker, stated that even if Mother maintained her sobriety and good mental health, she would have a difficult time caring for the children. Peterson also stated that it would be difficult for Mother to balance the children's and her own therapy sessions. Additionally, based on Peterson's observations of Mother's visitations with the children in 2016, Peterson stated that it would continue to be difficult for Mother to manage the children's behaviors. Peterson testified that she believed it could be possible to reintegrate the children with Mother in the future, but she stated she would not suggest moving them back into Mother's care that day. In sum, Peterson stated that the children needed permanency.

Mother admitted at the hearing that she was ready to start taking steps toward having the children back in her care. Mother's testimony did not state the length of time she would need; rather, it discussed additional tasks she felt she needed to complete, such as obtaining a full-time job, maintaining sobriety, and maintaining a positive support system. But Dr. Dirks expressed concern over Mother's ability to change her circumstances regarding her relationship with Father and substance abuse issues. Dr. Dirks testified that Mother's relationship with Father for three years—but not the last six months—shows that Mother remained with Father even when she had the children placed

29

in her home and despite Dr. Dirks telling Mother that Father was a bad influence. Dr. Dirks felt Mother should never have a relationship with Father in the future.

In viewing the evidence in the light most favorable to the State, the district court's finding that Mother would remain unfit for the foreseeable future is supported by clear and convincing evidence. Mother made positive improvements during the course of this case. However, sufficient evidence supports the district court's finding that it is highly probable that Mother could not adequately provide the permanency that these young children need within the foreseeable future.

III.     DID THE DISTRICT COURT ABUSE ITS DISCRETION IN FINDING THAT TERMINATION OF MOTHER'S PARENTAL RIGHTS WAS IN THE CHILDREN'S BEST INTERESTS?

Mother asserts that the district court did not adequately decide whether the termination of her parental rights was in the best interests of the children.

If the district court "makes a finding of unfitness, the court shall consider whether termination of the parental rights . . . is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2016 Supp. 38-2269(g)(1). The district court is in the best position to make findings on the best interests of the children, and we will not disturb the district court's judgment absent an abuse of judicial discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* October 7, 2010. An abuse of discretion occurs when no reasonable person would agree with the district court or if it bases the decision on an error of fact or an error of law. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2.

Mother asserts that the district court failed to weigh the children's best interests based on another panel of this court's decision in *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010):

"K.S.A. 2009 Supp. 38-2269(g)(1) requires the court to consider whether termination of parental rights is in the best interests of the subject children. This statutory requirement requires the court to weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, the court must consider the nature and strength of the relationships between the children and parent and the emotional trauma that may be caused to the children by termination of the parental rights, weighing these considerations against a further delay in permanency for the children."

Mother argues that the district court improperly emphasized her past poor behavior and did not weigh the benefits of permanency or the strength of the children's and Mother's relationship in deciding whether termination would be in the children's best interests. We disagree.

The district court here made an adequate determination of the children's best interests. Specifically, the district court stated:

"Considering the physical, mental, or emotional health of each child, termination of parental rights is in the best interests of the children named above and the physical, mental or emotional needs of the children would best be served by termination of parental rights. These children have suffered emotional trauma when residing with parents prior to court involvement due to the parent's lack of stability, drug use, incarcerations and domestic violence. The children were reintegrated, but despite intensive services they were subject to the same issues, and once again removed from the mother's care. There is no reason to believe that this cycle will not occur yet again if the children were reintegrated a second time. These children have been in foster care [for] over two years. The children are currently living with uncertainty, not knowing who will be raising them.

31

Given the children's ages, the time spent in foster care without successful reintegration, and considering the children's special needs, especially [M.A., Jr.'s] emotional needs, as well as their general need for permanency, it is in each child's interest that termination of parent rights occur."

The district court's ruling that it was in the children's best interests to terminate Mother's parental rights was not unreasonable based on the time the children spent in foster care and Mother's inability over the case's three-year period to end the cycle of drug use, incarceration, and domestic violence. The district court considered Mother's continued interaction with the children and reasoned that a second reintegration would not likely succeed based on the failure of intensive efforts from public agencies and Mother's behavior during the first effort. Although the district court did not make express statements regarding the strength of Mother's and the children's relationship, the district court considered the continued effect of the children's presence in foster care versus the need for the children to have permanency in their young lives. The district court concluded that because Mother's behavior over the three-year span of the case had not improved, Mother could not provide the permanency the children needed.

Based on the record the district court's best interests finding was not an abuse of discretion. Peterson, the permanency caseworker, stated that the children's foster family was an adoptive resource. Peterson testified that the foster family wanted the children's behavior to improve and that they believed that the visits with Mother led to an increase in the children's problematic behaviors. Although the district court did not issue a specific best interests finding for each child, the district court took into account the children's special needs as a whole, and particularly M.A., Jr.'s emotional needs, as required under K.S.A. 2016 Supp. 38-2269(g)(1). Additionally, the district court considered the children's ages and the time spent in foster care to the first hearing in the termination proceeding. The record provides that the children had been in foster care since July 2013 and out of Mother's physical custody for about two years in total. Although Mother

32

improved herself enough to reintegrate the children into her home once, her behavior during the children's placement in her home—which mirrored Mother's behavior when the children were first placed in State custody—prevented the children from remaining there. As a result, the district court concluded that the termination of Mother's parental rights was in the best interests of the children in order to provide them with a better chance for permanency with their primary caretakers. Accordingly, the district court did not abuse its discretion in finding the termination of Mother's parental rights was in the children's best interests.

Affirmed.