NOT DESIGNATED FOR PUBLICATION

No. 120,415

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of R.F.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court; NEIL B. FOTH, judge. Opinion filed June 7, 2019. Reversed and remanded with directions.

*Dennis J. Stanchik*, of Olathe, for appellant natural father.

*Jacob M. Gontesky*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: T.F. contends the State presented insufficient evidence to the Johnson County District Court to prove him an unfit father to R.F., his minor son, and the court, therefore, erred in terminating his parental rights. We agree. The social service agency overseeing efforts to restore the family improperly cut off T.F.'s visits and communication with R.F. The district court, as we explain, largely rested its termination decision on the lack of contact between T.F. and R.F. during the following 14 months—a circumstance more indicative of bureaucratic fumbling than parental unfitness. So we reverse the district court's order of termination. Because R.F. remains a child in need of care, we remand for further proceedings.

1

This case has a long and seemingly intricate factual and procedural history. The record on appeal, including the evidence presented at the termination hearing, leaves many unilluminated nooks and crannies. We dispense with any discussion of those aspects of the case and otherwise endeavor to pare down the history to focus on the issue before us.

Before this case began, T.F. regularly left R.F. with a man and woman living in Johnson County. R.F.'s stays with the couple grew in frequency and duration, so T.F. saw his son sporadically for a few days at a time. From the record, it appears R.F.'s mother was never really involved in his care. Her rights were terminated in this case, and she has not appealed. She and T.F. were not married.

In October 2014, when R.F. was about three-and-a-half years old, the State filed a petition to have him declared in need of care, as provided in the Revised Kansas Code for Care of Children, K.S.A. 2014 Supp. 38-2201 et seq. The allegations in the petition principally came from the people who had been caring for R.F. and indicated the child may have been poorly supervised when he was with T.F. and acted out in inappropriate ways upon his return from visits with his father. As a result, the Department for Children and Families was given temporary custody of R.F., and he remained in the physical custody of the Overland Park couple. About five months later, the district court formally adjudicated R.F. to be a child in need of care and ordered paternity testing to conclusively establish his familial relationship with T.F. The testing confirmed T.F. to be R.F.'s father.

The district court directed KVC, as the assigned social service agency, to develop a plan to reintegrate T.F. and R.F. as a family. The district court extended the plan at least once and ordered that T.F. participate in "cognitive therapy" for reasons that are not readily apparent from the appellate record.

In June 2016, the State filed a motion to terminate T.F.'s parental rights. In early November, shortly before the scheduled termination hearing, T.F. filed a motion asking the district court to consider allowing his brother and his brother's wife to adopt R.F. In support of the motion, T.F. submitted a signed consent to an adoption by his brother and his brother's wife and agreed to "give up all custody and parental rights" to R.F. if they were approved as adoptive parents. The submission indicated T.F.'s relatives were agreeable, and they provided some general biographical information about themselves. The district court continued the termination hearing, so the proposed adoption could be explored.

The district court took the matter up again in September 2017. The guardian ad litem for R.F. opposed the adoption, precluding that option from going forward. See K.S.A. 2017 Supp. 38-2268(a). The record on appeal again sheds no light on the precise reason. The district court then scheduled the termination hearing for late November. The hearing was continued several times, and in February 2018, the district court appointed a new lawyer to represent T.F., further delaying the termination hearing.

The district court held the termination hearing in September 2018. The State called as its only witnesses three employees of KVC who were sequentially assigned to oversee the case and R.F.'s ultimate placement. The first of those caseworkers took over responsibility for the reintegration plan in August 2016, nearly two years after the petition had been filed, and continued through mid-July 2017.

The first caseworker initially supervised weekly visits between T.F. and R.F. She testified that T.F. displayed good parenting skills and interacted appropriately with R.F. She described T.F. as having a bond with R.F. and said the two related well. The caseworker testified that she and T.F. had an argument at the end of one of the visits because he had not been informed that R.F. had been in a motor vehicle collision. The

caseworker said she attempted to apologize for the lack of notice but T.F. was unmollified and eventually called the police. She testified that at the next visit T.F. accused KVC of being racist and said he wanted an African-American caseworker.

The caseworker testified that after the State filed the motion to terminate parental rights T.F.'s visits with R.F. were cut back from once a week to once a month. According to the caseworker, T.F. participated in those visits but did little else called for in the reintegration plan. She specifically noted T.F. stopped going to therapy and did not submit to drug testing.

At the termination hearing, T.F. testified that he attended several therapy sessions. He agreed that he stopped going without KVC's approval. The State offered no evidence that T.F. had a substance abuse problem immediately before or during this case or that he ever tested positive for illegal drugs.

The caseworker testified that KVC, with approval from the Department, determined that T.F.'s consent to have his relatives adopt R.F. should be treated as a general relinquishment of his parental rights. Based on that assessment, KVC terminated visitation between T.F. and R.F. in July 2017. But a relinquishment of parental rights to the Department is not the same as a consent to adoption. See K.S.A. 2018 Supp. 38-2268(b)(1), (d). On appeal, the State has not argued that T.F.'s motion for adoption and the supporting documents amounted to a relinquishment of his parental rights to the Department.

The second KVC caseworker had responsibility for the case from July 2017 through January 2018. She supervised the last visit between T.F. and R.F. in July 2017. She testified that she had no communication from T.F. after that visit. She did not say whether she attempted to contact T.F. The last caseworker was assigned in January 2018 as an adoption case manager and continued through the termination hearing. She, too,

4

reported having no communication from T.F. She testified she made no effort to contact T.F.

Those caseworkers testified T.F. did not attend case plan meetings in September 2017 and June 2018. Although they said T.F. should have been notified of those meetings, they could not confirm that happened. T.F. testified he did not recall getting notices for those meetings. He agreed he did not attempt to communicate with KVC after being told he would not be allowed any more visits or other contact with R.F.

T.F. testified he has worked at the same job and has lived in the same apartment in a Kansas City, Missouri, suburb since 2014. The State did not dispute that evidence. None of the witnesses suggested T.F. was unable to financially support R.F. or lacked a suitable residence for him. The evidence indicated that R.F. was doing well in the foster placement, which remained constant through the termination hearing. Nothing in the record suggests R.F. has any physical or cognitive limitations.

In its written decision terminating T.F.'s parental rights, the district court focused on the lack of visits or other communication between father and son for the 14 months leading up to the termination hearing. That roughly dated to their last contact in July 2017, when KVC terminated visitation. The district court also faulted T.F. for failing to take any steps to try to resume some sort of approved contact with R.F. The district court concluded those circumstances rendered T.F. an unfit parent under the Code in three respects: (1) "physical, mental, or emotional abuse or neglect" of R.F., as provided in K.S.A. 2018 Supp. 38-2269(b)(4); lack of effort to adjust his "circumstances . . . to meet the needs" of R.F., as provided in K.S.A. 2018 Supp. 38-2269(b)(8); and failure to "maintain regular visitation, contact or communication" with R.F. after his custodial placement outside the home, as provided in K.S.A. 2018 Supp. 38-2269(c)(2). The district court also found that T.F.'s unfitness was unlikely to change in the foreseeable future and that R.F.'s best interests were served by the termination of parental rights. See

5

K.S.A. 2018 Supp. 38-2269(a), (g)(1). Having made the requisite statutory findings, the district court ordered the termination of T.F.'s parental rights as to R.F.

T.F. has timely appealed the termination order.

LEGAL ANALYSIS

On appeal, T.F. challenges the sufficiency of the evidence to support the statutory grounds on which the district court found him to be unfit. He doesn't specifically dispute the conclusions on the unlikelihood of change or R.F.'s best interests. But if T.F. is correct about unfitness, the district court's other findings alone cannot support the termination order. All three—unfitness, unlikelihood of change, and best interests—are necessary conditions to terminate parental rights. Before turning to the district court's specific rulings, we outline some key legal principles in termination proceedings.

A parent has a constitutionally recognized right to a continuing relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). The right represents the archetype substantive liberty interest shielded in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and, thus, may be fairly characterized as fundamental. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). Accordingly, the State may terminate a parent's right to raise a minor child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

6

After a child has been adjudicated in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a). In considering a parent's unfitness, the district court may apply one or more of the grounds outlined in K.S.A. 2018 Supp. 38-2269(b) and (c), as the court did here. A single ground may be sufficient to establish unfitness. See K.S.A. 2018 Supp. 38-2269(f). The district court can also look at nonstatutory circumstances demonstrating parental unfitness. See K.S.A. 2018 Supp. 38-2269(b) (district court "not limited to" listed factors in considering unfitness).

The statutory factors are illustrative of parental "unfitness," but the Code contains no formal definition of the term. The Kansas Supreme Court has surveyed cases discussing unfitness in termination proceedings and suggests the condition entails unsuitability and incompetence, often coupled with some moral dereliction. *In re Brooks*, 228 Kan. 541, 546-47, 618 P.2d 814 (1980). This court has equated unfitness with the "incapacity to perform parental obligations." *In re A.N.P.*, 23 Kan. App. 2d 686, 692, 934 P.2d 995 (1997); see *In re Adoption of A.M.M.*, No. 109,247, 2013 WL 5507483, at *5 (Kan. App. 2013) (unpublished opinion); *In re Baby Girl E.*, No. 103,740, 2010 WL 4668356, at *4 (Kan. App. 2010) (unpublished opinion). More recently, this court has pointed out that simply being a below average parent does not equate to unfitness warranting termination, even if other available options arguably might be demonstrably better for the child. *In re A.M.*, No. 116,391, 2017 WL 2022704, at *1 (Kan. App. 2017) (unpublished opinion).

When the sufficiency of the evidence supporting a district court's decision to terminate parental rights is challenged, an appellate court will uphold the ruling if, after reviewing the evidence in the record in a light most favorable to the prevailing party, the findings are supported by clear and convincing evidence or, stated another way, the

7

appellate court is persuaded that a rational fact-finder could have found it highly probable that the circumstances justify the termination of parental rights. *In re B.D.-Y.*, 286 Kan. at 705. In evaluating the record, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Here, we must view the evidence presented at the termination hearing in favor of the State, as the prevailing party.

The district court's statutory grounds for finding T.F. to be an unfit parent all derive from the same constellation of facts—the lack of contact and communication between T.F. and R.F. for the 14 months leading up to the termination hearing. But, as we indicated at the outset and as the hearing evidence showed, KVC cut off the visitation and communication based on an erroneous interpretation of the conditional consent to adopt T.F. signed in favor of his family members. The lapse of contact was not T.F.'s volitional decision, as with a parent simply abandoning a child, or a product of his otherwise blameworthy conduct, as with a parent incarcerated for a long time on a serious criminal conviction.

The circumstances here would be markedly different if T.F. simply chose not to participate in scheduled visitation with R.F. during the reintegration process. That would be a compelling factor tilting toward unfitness. Not to put too fine a point on it, we don't have that sort of situation. To the contrary, T.F. participated in the visits he was allowed with R.F. and appeared to work toward cultivating a relationship with his son to the extent permitted through that contact. His efforts reflected a significant positive step toward reintegration. But those efforts were shut down by KVC, the agency that was supposed to be supporting and promoting reintegration.

In the face of the agency edict, T.F. did not try to contest that decision or to restart visitation with R.F. There was no obvious channel for T.F. to do so. We find his failure to

8

fight with the bureaucracy at that stage in the proceedings with a termination hearing in the offing to be understandable. From his perspective, the die seemed to have been cast subject to the outcome of the hearing. More to the point, perhaps, T.F.'s inaction does not manifest some sort of parental dereliction rising to the level of unfitness.

Based on the evidence, T.F. displayed none of the common characteristics that thwart successful reintegration: Lack of stable employment; inability to secure suitable housing; chronic substance abuse coupled with failed efforts at rehabilitation; or some forms of severe, unameliorated mental illness. Singly or in combination those conditions can defeat even well-intentioned parents in regaining legal and physical custody of their children.

The district court mentioned T.F.'s apparent failure to complete a designated series of sessions with a therapist as factoring into its termination ruling. The evidence indicates T.F. did attend a majority of the scheduled sessions. Nothing in the record outlines why therapy was required as part of the reintegration plan, and none of the KVC caseworkers testified T.F. posed some risk as a parent because he didn't complete the counseling. We do not see this as a material basis to find T.F. unfit.

Given our standard of review and fully crediting the State's evidence at the termination hearing, we rather readily recognize a reasonable fact-finder could not have concluded to a high degree of probability T.F. was unfit to parent R.F. within the meaning of the code. R.F. arguably might have a more advantageous upbringing in his current placement or with relatives other than T.F. But that is not and cannot be the test for termination. We, therefore, reverse the district court's termination order.

R.F., however, remains a child in need of care. T.F. has not disputed that earlier finding.[*] Accordingly, we remand with directions that the district court direct that a new reintegration plan be prepared and fairly implemented.

9

[*]T.F. appeared with his lawyer at the adjudication hearing where R.F. was found to be in need of care. But the district court did not allow T.F. to actively participate because his paternity had not yet been confirmed through genetic testing. We do not understand that T.F. ever denied paternity and certainly had exercised parental authority before this case began. After the testing proved paternity, T.F. did not seek reconsideration of R.F.'s adjudication as a child in need of care. We express no opinion on whether the adjudication now may be revisited in the district court. The issue has not been raised for our consideration.

Reversed and remanded with directions.